## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA,
## ORLANDO DIVISION

**KALLEMEYN COLLISION CENTER, INC.**                    **PLAINTIFFS**
    **ET AL**

**VS.**                                                 **CAUSE NO. 6:14-CV-6011**

**21ST CENTURY CENTENNIAL INSURANCE**
    **COMPANY, ET AL**

---

### AMENDED COMPLAINT

### JURY TRIAL DEMANDED

---

_____COME NOW, Plaintiffs in the above-captioned cause and submit this, their Amended Complaint, pursuant to the Federal Rules of Civil Procedure, and the Orders of this Court entered 17 August, 2015, (Docket No. 222, 6:14-md-2557) and September 15, 2014 (Docket No. 42, 6:14-md-2557) and other applicable authority and file this, their Amended Complaint against the above-captioned Defendants, and in support thereof, states the following:

### JURISDICTION AND VENUE

1.    Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

### AMENDMENT TO THE PARTIES

2.    Plaintiff Quality Auto Body, Inc., is added as a Plaintiff.

3.    Plaintiff Douglas Auto Body, Inc. is deleted as a Plaintiff.

## PARTIES

4.      Plaintiff Kallemeyn Collision Center, Inc., is an Illinois corporation authorized to do business and is doing business at 16039 New Avenue, Lemont, Illinois 60439.

5.      Plaintiff Mitchell's Motors, Inc., is an Illinois corporation authorized to do business and is doing business at 2749 W. 139th Street, Posen, Illinois 60469.

6.      Plaintiff S. Danihel Collision, Inc., is an Illinois corporation authorized to do business and is doing business at 11641 S. Ridgeland, Alsip, Illinois 60803.

7.      Plaintiff Blue Island Broadway Auto Rebuilders, Inc., d/b/a Broadway Collision Center, is an Illinois corporation authorized to do business and is doing business at 2940 Minnesota Avenue, Blue Island, Illinois 60406.

8.      Plaintiff Knebel Autobody Center, Inc., is an Illinois corporation authorized to do business and is doing business at 2702 State Route 160, Highland, Illinois 62249.

9.      Plaintiff Quality Auto Body, Inc., is an Illinois corporation authorized to do business and is doing business at 101 N. Adams Avenue, Freeport, Illinois 61032.

10.     Defendant 21st Century Centennial Insurance Company is a Pennsylvania insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 2595 Interstate Drive, Harrisburg, Pennsylvania 17110.

11.     Defendant 21st Century North America Insurance Company is a New York insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 21st Century Plaza, 3 Beaver Valley Road, Wilmington, Delaware 19803.

12.    Defendant Affirmative Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 9030, Addison, Texas 75001.

13.    Defendant AIG Property Casualty Company is a Pennsylvania insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.

14.    Allied Property and Casualty Insurance Company is an Iowa insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One West Nationwide Boulevard, 1-04-701, Columbus, Ohio 43215.

15.    Defendant Allstate Fire and Casualty Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3075 Sanders Road, Suite H1E, Northbrook, Illinois 60062.

16.    Defendant Allstate Indemnity Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3075 Sanders Road, Suite H1E, Northbrook, Illinois 60062.

17.    Defendant Allstate Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3075 Sanders Road, Suite H1E, Northbrook, Illinois

60062.

18.    Defendant Allstate Property and Casualty Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3075 Sanders Road, Suite H1E, Northbrook, Illinois 60062.

19.    Defendant American Access Casualty Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 2211 Butterfield Road, Suite 200, Downers Grove, Illinois 60515.

20.    Defendant American Bankers Insurance Company of Florida is a Florida insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 11222 Quail Roost Drive, Miami, Florida 33157.

21.    Defendant American Family Mutual Insurance Company is a Wisconsin insurance company  authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 6000 American Parkway, Madison, Wisconsin 53783.

22.    Defendant American Freedom Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 559 West Golf Road, Arlington Heights, Illinois 60005.

23.    Defendant American Heartland Insurance Company is an Illinois insurance company

authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 5700 Old Orchard Road, Suite 300, Skokie, Illinois 60077.

24.     Defendant Amica Mutual Insurance Company is a Rhode Island insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 6008, Providence, Rhode Island 02940.

25.     Defendant Apollo Casualty Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 805 Estelle Drive, Suite 209, Lancaster, Pennsylvania 17601.

26.     Defendant Auto-Owners Insurance Company is a Michigan insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 30660, Lansing, Michigan 48909.

27.     Defendant Country Casualty Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 2100, Bloomington, Illinois 61702.

28.     Defendant Country Mutual Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 2100, Bloomington, Illinois 61702.

29.     Defendant Country Preferred Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is P.O. Box 2100, Bloomington, Illinois 61702.

30.    Defendant Dairyland Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1800 North Point Drive, Stevens Point, Wisconsin 54481.

31.    Defendant Delphi Casualty Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1862 Charter Lane, Suite 102, Lancaster, Pennsylvania 17601.

32.    Defendant Encompass Home and Auto Insurance Company  is an Illinois insurance company  authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3075 Sanders Road, Suite H1E, Northbrook, Illinois 60062.

33.    Defendant Erie Insurance Company is a Pennsylvania insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 100 Erie Insurance Place, Erie, Pennsylvania 16530.

34.    Defendant Erie Insurance Exchange is a Pennsylvania insurance exchange for which Erie Indemnity Company stands as attorney-in-fact.  This Defendant's address, as reported to the Illinois Department of Insurance, is 100 Erie Insurance Place, Erie, Pennsylvania 16530.

35.    Defendant eSurance Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 650 Davis Street, San Francisco, California 94111.

36.     Defendant eSurance Property and Casualty Insurance Company is a California insurance company  authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 650 Davis Street, San Francisco, California 94111.

37.     Defendant Farmers Automobile Insurance Association is an Illinois insurance exchange for which  Farmers Automobile Management Corporation stands as attorney-in-fact.  This Defendant's address, as reported to the Illinois Department of Insurance, is c/o Farmers Automobile Management Corporation, 2505 Court Street, Pekin, Illinois 61558.

38.     Defendant First Acceptance Insurance Company, Inc., is a Texas insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 3813 Green Hills Village Drive, Nashville, Tennessee 37202.

39.     Defendant Founders Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1111 East Touhy Avenue, Suite 300, Des Plaines, Illinois 60018.

40.     Defendant GEICO Casualty Company is a Maryland insurance company  authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1 GEICO Plaza, Washington, D.C. 20076.

41.     Defendant GEICO Casualty Company is a Maryland insurance company  authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1 GEICO Plaza, Washington, D.C. 20076.

42.     Defendant GEICO General Insurance Company is a Maryland insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1 GEICO Plaza, Washington, D.C. 20076.

43.     Defendant GEICO Indemnity Company is a Maryland insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1 GEICO Plaza, Washington, D.C. 20076.

44.     Defendant Government Employees Insurance Company is a Maryland insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 1 GEICO Plaza, Washington, D.C. 20076.

45.     Defendant Grange Indemnity Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 671 South High Street, Columbus, Ohio 43216.

46.     Defendant Grange Mutual Casualty Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 671 South High Street, Columbus, Ohio 43216.

47.     Defendant Great Northern Insurance Company is an Indiana insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 15 Mountain View Road, Warren, New Jersey 07061.

48.     Defendant Harleysville Lake States Insurance Company is a Michigan insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 355 Maple Avenue, Harleysville, Pennsylvania 19438.

49.     Defendant Hartford Accident and Indemnity Company is a Connecticut insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Hartford Plaza, Hartford, Connecticut 06155.

50.     Defendant Hartford Casualty Insurance Company is an Indiana insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Hartford Plaza, Hartford, Connecticut 06155.

51.     Defendant Hartford Fire Insurance Company is a Connecticut insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Hartford Plaza, Hartford, Connecticut 06155.

52.     Defendant Hartford Insurance Company of Illinois is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Hartford Plaza, Hartford, Connecticut 06155.

53.     Defendant Hartford Underwriters Insurance Company is a Connecticut insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's

address, as reported to the Illinois Department of Insurance, is One Hartford Plaza, Hartford, Connecticut 06155.

54.     Defendant Horace Mann Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is One Horace Mann Plaza, Springfield, Illinois 62715.

55.     Defendant Horace Mann Property and Casualty Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is One Horace Mann Plaza, Springfield, Illinois 62715.

56.     Defendant Illinois Farmers Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 2245 Sequoia Drive, Aurora, Illinois 60506.

57.     Defendant Kemper Independence Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is One East Wacker Drive, Suite 1500, Chicago, Illinois 60601.

58.     Defendant Liberty Insurance Corporation is an Illinois insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 175 Berkeley Street, Boston, Massachusetts 02116.

59.     Defendant Liberty Mutual Fire Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's

address, as reported to the Illinois Department of Insurance, is 175 Berkeley Street, Boston, Massachusetts 02116.

60.     Defendant LM General Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 175 Berkeley Street, Boston, Massachusetts 02116.

61.     Defendant LM Insurance Corporation is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 175 Berkeley Street, Boston, Massachusetts 02116.

62.     Defendant Mercury Insurance Company of Illinois is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 560 East Bunker Court, Vernon Hills, Illinois 60061.

63.     Defendant Mid-Century Insurance Company is a California insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 4680 Wilshire Boulevard, Los Angeles, California 90010.

64.     Defendant Nationwide Insurance Company of America is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 902 Ann Street, Madison, Wisconsin 53713.

65.     Defendant Nationwide Mutual Fire Insurance Company is an Ohio insurance

company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One West Nationwide Boulevard, Columbus, Ohio 43215.

66.     Defendant Nationwide Mutual Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One West Nationwide Boulevard, Columbus, Ohio 43215.

67.     Defendant Nationwide Property and Casualty Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One West Nationwide Boulevard, Columbus, Ohio 43215.

68.     Defendant Progressive Direct Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is W33, 6300 Wilson Mills Road, Mayfield Village, Ohio 44143.

69.     Defendant Progressive Northern Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is W33, 6300 Wilson Mills Road, Mayfield Village, Ohio 44143.

70.     Defendant Property and Casualty Insurance Company of Hartford is an Indiana insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Hartford Plaza,

Hartford, Connecticut 06155.

71.     Defendant Safe Auto Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 4 Easton Oval, Columbus, Ohio 43219.

72.     Defendant Safeco Insurance Company of Illinois is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 175 Berkeley Street, Boston, Massachusetts 02116.

73.     Defendant Safeway Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 790 Pasquinelli Drive, Westmont, Illinois 60559.

74.     Defendant Secura Supreme Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 2401 S. Memorial Drive, Appleton, Wisconsin 54915.

75.     Defendant State Farm Fire and Casualty Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One State Farm Plaza, Bloomington, Illinois 61710.

76.     Defendant State Farm Mutual Automobile Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One State Farm Plaza, Bloomington,

Illinois 61710.

77.     Defendant Travelers Commercial Insurance Company is a Connecticut insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Tower Square, Hartford, Connecticut 06183.

78.     Defendant The Travelers Home and Marine Insurance Company is a Connecticut insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is One Tower Square, Hartford, Connecticut 06183.

79.     Defendant Unique Insurance Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 7400 North Caldwell Avenue, Niles, Illinois 60714.

80.     Defendant Universal Casualty Company is an Illinois insurance company authorized to do business and is doing business in the State of Illinois.  Per information reported to the Illinois Department of Insurance, this Defendant is currently operating under the name Mendakota Casualty Company. This Defendant's address, as reported to the Illinois Department of Insurance, is 150 Pierce Road, 6th Floor, Itasca, Illinois 60143.

81.     Defendant USAA Casualty Insurance Company is a Texas insurance company authorized to do business and is doing business in the State of Illinois.  This Defendant's address, as reported to the Illinois Department of Insurance, is 9800 Fredericksburg Road, San Antonio, Texas 78288.

82.     Defendant USAA General Indemnity Company is a Texas insurance company

authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 9800 Fredericksburg Road, San Antonio, Texas 78288.

83.    Defendant West Bend Mutual Insurance Company is a Wisconsin insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is 1900 South 18th Avenue, West Bend, Wisconsin 53095.

84.    Defendant Westfield Insurance Company is an Ohio insurance company authorized to do business and is doing business in the State of Illinois. This Defendant's address, as reported to the Illinois Department of Insurance, is One Park Circle, Westfield Center, Ohio 44251.

85.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant in the above paragraphs engaged in the activity or conduct described. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

## DEFENDANT CORPORATE FAMILIES

86.    Defendants 21st Century Centennial Insurance Company, 21st Century North America Insurance Company, Farmers Automobile Insurance Association, Mid-Century Insurance Company, Illinois Farmers Insurance Company are subsidiaries of, directly or indirectly, or under the control of Farmers Insurance Group via status as attorney-in-fact. Farmers Insurance Group, Inc., is itself owned by Zurich Insurance Group. Use of the term "Farmers" within this Amended Complaint refers to all of these entities.

87.    Defendants Allstate Fire and Casualty Insurance Company, Allstate Indemnity

Company, Allstate Insurance Company Allstate Property and Casualty Insurance Company, Encompass Home and Auto Insurance Company, eSurance Insurance Company, eSurance Property and Casualty Insurance Company are subsidiaries, directly or indirectly, of Allstate Corporation. Unless otherwise indicated, use of the term "Allstate" within this Amended Complaint refers to all of these entities.

88.     Defendants Country Casualty Insurance Company and Country Preferred Insurance Company are subsidiaries of Defendant Country Mutual Insurance Company.  Defendant Country Mutual Insurance Company is a subsidiary of Country Financial.  Unless otherwise indicated, use of the term "Country" within this Amended Complaint refers to all of these entities.

89.     Defendants GEICO Casualty Company, GEICO General Insurance Company, GEICO Indemnity Company and Government Employees Insurance Company are all directly or indirectly wholly owned subsidiaries of Berkshire Hathaway, Inc.  Unless otherwise noted, use of the term "GEICO" within this Amended Complaint refers to all of these Defendants.

90.     Defendants Nationwide Insurance Company of America, Nationwide Mutual Fire Insurance Company, Nationwide Mutual Insurance Company, Nationwide Property and Casualty Insurance Company, Harleysville Lake States Insurance Company, Allied Property and Casualty Insurance Company are all subsidiaries or affiliates of Nationwide.  Unless otherwise noted, use of the term "Nationwide" within this Amended Complaint refers to all of these Defendants.

91.     Defendants Grange Indemnity Insurance Company and Grange Mutual Casualty Company are subsidiaries of Grange Mutual Casualty Group.  Unless otherwise noted, use of the term "Grange" within this Amended Complaint refers to both of these Defendants.

92.     Defendants Hartford Accident and Indemnity Company, Hartford Casualty Insurance

Company, Hartford Fire Insurance Company, Hartford Insurance Company of Illinois, Hartford Underwriters Insurance Company Property and Casualty Insurance Company of Hartford are all subsidiaries of the Hartford Financial Services Group, Inc.  Unless otherwise noted, use of the term "Hartford" or "the Hartford" within this Amended Complaint refers to all of these Defendants.

93.     Defendants Horace Mann Insurance Company and Horace Mann Property and Casualty Insurance Company are both members of the Horace Mann Insurance Group.  Unless otherwise noted, use of the term "Horace Mann" within this Amended Complaint refers to both these Defendants**.**

94.     Defendants Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, LM General Insurance, LM Insurance Corporation, Safeco Insurance Company of Illinois are all members of Liberty Mutual Group which is itself a subsidiary of Liberty Mutual Holding Company, Inc..  Unless otherwise noted, use of the term "Liberty Mutual" within this Amended Complaint refers to all of these Defendants.

95.     Defendants Progressive Direct Insurance Company and Progressive Northern Insurance Company are both are subsidiaries of the Progressive Corporation.  Unless otherwise noted, use of the term "Progressive" within this Amended Complaint refers to both of these Defendants.

96.     State Farm Fire and Casualty Company and State Farm Mutual Automobile Insurance Company are part of the State Farm corporate family.  Unless otherwise noted, use of the term "State Farm" within this Amended Complaint refers to both of these Defendants.

97.     Travelers Commercial Insurance Company, The Travelers Home and Marine

Insurance Company are subsidiaries of The Travelers Companies, Inc.[1]  Unless otherwise noted, use of the term "Travelers" within this Amended Complaint refers to all of these Defendants.

98.     USAA Casualty Insurance Company and USAA General Indemnity Company are are   operating companies of USAA. Unless otherwise noted, use of the term "USAA" within this Amended Complaint refers to both of these Defendants.

99.     Defendants Apollo Casualty Company and Delphi Casualty Company are subsidiaries/affiliates of American Independent Companies ("AIC").  Unless otherwise noted, use of the term "AIC" within this Amended Complaint refers to both of these Defendants.

100.     Defendant Founders Insurance Company is a subsidiary of Utica National Insurance Group.

101.     Defendant Unique Insurance Company is a member of Haludu Corporation.

102.     Defendant American Heartland Insurance Company is a subsidiary of United Equitable Group, Ltd.

103.     Defendant American Freedom Insurance Company is a subsidiary of Western National Mutual Group.

104.     Defendant Dairyland Insurance Company is a subsidiary of/affiliated with the Sentry Group.

105.     Defendant American Bankers Insurance Company is a subsidiary of Assurant, Inc.

## FACTS

106.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles

---

[1]See http://sec.edgar-online.com/travelers-companies-inc/10-k-annual-report/2014/02/13/section55.aspx

involved in collisions.

107.    Plaintiffs perform repairs on vehicles primarily garaged at locations throughout the State of Illinois.   Plaintiffs located convenient to the Interstate 10, 20 and 65 also perform repairs on vehicles primarily garaged at locations outside the State of Illinois.

108.    Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Illinois, and payment of claims to third-party claimants, resident both within or without the State of Illinois.

109.    The Plaintiff body shops have done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair services.

110.    Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

111.    Over the course of several years (as further described below), the Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

112.    Defendants have intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops

which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

113.    Defendants' actions have caused a complete eradication of competition within the body shop industry.

114.    Defendants actions have substantially harmed Plaintiffs.

115.    Defendants' actions violate federal and state law.

<u>Defendants' Market Share within the Market Area of the State of Illinois</u>

116.    According to the information reported to the National Association of Insurance Commissioners, as of December 31, 2012, the named Defendants hold **over eighty six percent (86%)** of the private passenger auto insurance market in the market area of the State of Illinois.  See 2013 National Association of Insurance Commissioners Private Passenger Auto market share report attached hereto as Exhibit "1."

Market shares of reported respective Defendants are:
- State Farm Group                          30.33%
- Allstate Group                            11.40%
- Country Financial Group                    7.50%
- Zurich Group (Farmers)                     5.46%
- Progressive Group                          4.75%

- Berkshire Hathaway Group (GEICO)           4.72%
- American Family Group                      4.51%
- Liberty Mutual Group                       3.00%
- United Services Automobile Group (USAA)    2.02%
- Travelers Group                            1.57%
- Nationwide Group                           1.54%
- Hartford Group                             1.45%
- American Access Casualty Co.               1.40%
- Auto-Owners Group                          1.22
- Erie Insurance Group                       0.97%
- Utica Group                                0.77%
- Haludu Corp. Group                         0.63%
- Kemper Group                               0.45%
- Affirmative Ins. Group                     0.41%
- Kingsway Group (Universal Casualty)        0.41%
- AIC Group                                  0.40%
- West Bend Mutual Ins. Co.                  0.37%
- United Equitable Group                     0.36%
- First Acceptance Ins. Group                0.36%
- State Auto Group                           0.34%
- Chubb Group (Great Northern)               0.33%
- Safeway Group                              0.32%
- Western National Mutual Group (American
  Freedom)                                   0.26%
- Sentry Group                               0.26%
- Mercury Group                              0.25%
- Safe Auto Ins. Co.                         0.24%
- Grange Mutual Cas. Group                   0.21%
- Amica Mutual Group                         0.18%
- Westfield Group                            0.17%
- Horace Mann Group                          0.16%
- Secura Ins. Group                          0.06%

- Assurant Inc. Group (American Bankers)          0.02%
- Metropolitan Group (MetLife)                    0.98%
- Hartford Group                                  0.64%
- First Acceptance Group                          0.58%
- ACCC Insurance                                  0.37%
- State Auto Group                                0.24%

117.    State Farm's market share translates into over $1.7 billion  in earned premiums collected from Illinois consumers.  Liberty Mutual's 3.0% market share collected for it nearly $170,000,000.00.  See Exhibit "1."

118.    Collectively the named defendants pocket nearly $5 billion from Illinois consumers each year.  A significant portion of this money is profit.  As shown by Exhibit "1," State Farm's direct loss to earned premium ratio, including defense and cost containment expenses, is 63.73. These loss and cost expenses include not only payment of claims but also overhead, such as office rent, salaries and similar costs of doing business.  Translated, the ratio shows a gross profit margin of over thirty-six percent (36%).  Allstate performed even better, with a gross profit margin of nearly forty-five percent (45%).

119.    Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs.  See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

120.    State Farm holds the substantial majority market share, not merely within the State of Illinois (see Exhibit "1") but nationally.  As of the end of 2014, State Farm held 18.68% of the

national private passenger market in the United States collecting earned premiums of over $35 billion.  The next closest competitor, GEICO, holds a national market share of slightly more than half that of State Farm.  See National Association of Insurance Commissioners 2014 Total Private Passenger Auto market share report attached hereto as Exhibit "2."

121.    State Farm thus stands as the company with the greatest power to exert substantial influence and control over the greatest number of consumers for auto repairs within the United States.

<u>Body Shop Cost and Revenue Structure</u>

122.    Body shops have several sources of cost and revenue: labor, parts, paint and materials, mechanical, electrical and administration.  Each of these categories often include subcategories with variable costs.

A.      <u>Labor</u>

123.    Collision repair involves several stages, each of which involves different activities and processes: body labor, painting and refinishing.  Ordinarily, each of these labor stages have individual labor rates.  For instance, posted labor rates for Plaintiff Kallemeyn's current rates include body labor at $52.00 per hour and refinish labor at $52.00.

A.1.    <u>Body Labor</u>

124.    Body Labor is the repair process wherein damage to the body of the vehicle is repaired, either by replacing a damaged part or mending it.

125.    Within body labor, there are different rates which vary with the material of which a vehicle is constructed.  Fiberglass composites and aluminum are more difficult to repair than steel,

require additional, specialized equipment and different skill sets of its technicians.  Therefore repairs on vehicles made of fiberglass composites (such as Corvettes) or aluminum body panels (such as Buick LeSabre, BMW Z8 and 7 Series and Nissan Altima) have higher hourly labor rates.

126.    Another aspect of labor is frame/unibody repair.  In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as not to further damage the frame/unibody, measured (usually by a laser measuring tool or other computerized optic or manual measuring tool) to determine both where the frame/unibody is damaged and how much damage has been sustained. The frame is then slowly pulled via hydraulic towers to reverse the incurred damage.  This process must be done at a deliberate pace as a rushed frame pull may cause further damage or destroy the frame altogether.  Plaintiff Knebel's frame repair rate is $60.00 per hour.

A.2.    Refinish

127.    Refinishing includes the processes necessary to complete repairs and smooth the repaired or replaced body surfaces once the body repair has been completed in preparation for painting.   Common refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat, and, depending upon the finish of the vehicle, an additional mid-coat.  Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

128.    Refinish labor rates are usually equal to body labor rates (see above).

A.3.    Paint and Materials

129.    Painting a vehicle is, in many ways, a process which does not require explanation.

However, application of paint to a vehicle is not a one-step process.  Paint is usually applied in a paint booth, a self-contained controlled environment, separate from the repair areas of a shop.  The booth must have a clean air intake filtering system to filter and reduce contaminants entering the booth, and an outgoing filtering system to reduce the contaminants released into the atmosphere.[2]

130.    Prior to painting, the vehicle must be washed.  the undamaged portions of the vehicle must be covered (or "masked") and taped off to avoid over-spray, including tires and wheel wells.  Once the painting has been completed,  a clear coat is applied and the vehicle left to dry.

131.    The process from repair to refinish to paint is usually not linear.  Most repairs require several refinishing processes and paint processes at various points in the repair.  For example, replacing a bumper.  The bumper must be sanded, primed and the inside of the bumper painted to match the vehicle before it is bolted onto the vehicle and the vehicle is returned to the refinish and paint processes to complete the repair.  Depending on the nature of the repair made and its location on a vehicle, a repair may require several refinish and paint procedures interspersed with repair procedures before completion.

132.    Additionally, it is not only the damaged portion of a car which must be addressed.  In order to avoid clashing paint at the point where the repaired portion meets the undamaged portion, the undamaged portion must be sanded  and the paint blended into the existing color to create a seamless transition between original paint and new paint.

133.    Because it is not possible, even in the controlled environment of a paint booth, to completely remove all dust and contaminants from a vehicle that has been on the open roads

---

[2]The Environmental Protection Agency has regulations for hazardous material emissions with which shops are required to comply.  Shops must also comply with hazardous material disposal requirements.

(particularly the undercarriage), the air pressure of the paint process causes some amount of dust and small contaminants to become airborne and settle in the paint.  When the paint dries, these contaminants cause an uneven surface in the paint.  An additional refinish process must be completed to smooth out the imperfections.  While there is some regional variation in the name, this process is generally recognized as de-nibbing and finessing.  Without this process, the finished product would not return the vehicle to its pre-loss condition.

134.    Traditionally, paint labor rates have included material costs, calculated as a percentage of refinish hours for a given repair, and expressed as an hourly rate based upon a standard repair.  However, in many instances, this method does not compensate the shop for the actual costs of labor and materials and result in the shop working at a loss.  For instance, pearlized finishes on vehicles require multiple steps, different paints and finishes to be applied in several stages and the job takes far longer and requires more labor than a one-step coat of white paint.

135.    Other times, vehicles have unique colors that require both special-order paints and mixing to achieve the desired result to blend with the undamaged portion of the vehicle.  Ferrari red, for example, is a unique color with high color saturation and brightness, and can only be achieved by mixing several different tints, thus requiring a shop to purchase several different paint colors for a single job.

136.    Because of this variability, which has become more frequent in recent years, the traditional method has not kept pace with the actual costs of completing repairs.  Many shops, though not all, have begun using a paint and material calculator, or PMC.  A PMC is a computer program which calculates the cost of the paint and materials actually used in a particular repair.  Actual costs

are pre-programmed to account for the costs of specific materials (i.e., Sikkens brand of paint versus Axalta brand of paint, which have different costs).  A shop can load the type of repairs completed and the program calculates the amount and cost of the materials used, produce an invoice and this becomes part of the final bill along with the paint labor costs.  This is particularly useful for capturing actual costs in situations such as that given above for the color Ferrari red where color matching requires the purchase of multiple tints, only a portion of each being used.  The PMC allows the shop to invoice only for the portion of each paint actually used.

137.    However, the majority of Defendants refuse to pay PMC invoices, though they are highly exact in calculating actual costs for paint and materials as PMC invoices ordinarily result in higher totals due from Defendants.

B.    Parts

138.    Parts constitute a significant expense for shops.  There are three types of parts generally recognized in the body shop industry: Original equipment manufacturer parts ("OEM" parts) are new parts manufactured by the same manufacturer as the vehicle.  OEM parts are specifically designed to fit specific cars.

139.    Aftermarket parts are new parts manufactured by a company other than the original equipment manufacturer.  These are frequently referred to as imitation or counterfeit parts.

140.    Salvage parts are parts stripped from previously wrecked vehicles.  Salvage parts are often referred to as "recycled parts" or "reconditioned parts" by insurance companies.

141.    Body shops do not keep a supply of all parts on hand.  Parts are ordered as needed.

142.    With very occasional exceptions mandated by state law, Defendant insurers write

estimates requiring use of aftermarket or salvage parts. Aftermarket and salvage parts are, ostensibly, less expensive than OEM parts and, at least according to Defendant insurers, of equal quality to OEM parts. This is not true, as discussed below.

143. Some insurers, such as State Farm, require use of an online parts procurement program called PartsTrader by its preferred shops. PartsTrader is a subscription online vendor market place. In theory, a subscribing shop can go onto the PartsTrader web site, input the part required and will receive bids from vendors who have the part available for sale and from these bids, the shop may select the proper part at a competitive price or, if a quality part is not available, may purchase the part elsewhere.

144. In reality, State Farm requires compulsory use of PartsTrader for its direct repair facilities (see below). A shop is not permitted to select the proper part or shop elsewhere if a quality part is not available through PartsTrader. State Farm requires the purchase of the cheapest part available, even if it is not of like kind or quality, originates from a source of questionable or unknown provenance or even is known to be manufactured of poor quality.

145. If a shop refuses to purchase such parts, but opts for a higher quality, safer part, the Defendant insurers, particularly but not exclusively State Farm, will pay only the amount for which the part could have been purchased, regardless of its quality or fit or lack thereof.

146. With respect to State Farm in particular, this practice benefits it in two direct fashions. First, it immediately reduces the amount it must pay out in repair costs. Second, State Farm is a primary investor in PartsTrader. It underwrote the cost of developing the program and has a contract with the ostensibly independent company for repayment of this investment as well as a portion of

the profits going forward.

147. With respect to the other Defendants, they benefit also by insisting on use of aftermarket or salvage parts as a means of reducing claims payments. In many instances, a Defendant insurer will order the parts independently and ship them to the body shop.

148. Defendants which do not independently order parts all or directly specify an aftermarket or salvage part and vendor from which a purchase must be made, again, regardless of quality, kind or fit.

149. Professional repairers on the whole prefer and recommend use of OEM parts for both safety and quality reasons. Aftermarket parts, while new, are generally inferior. There are no federal safety testing requirements for aftermarket crash parts. They are not subject to official testing for crashworthiness, fit, form or function. Aftermarket parts are often made of thinner materials, or multiple pieces spot-welded together instead of a single piece, which directly affects a vehicle's safety performance in a crash. Because they are not subject to federal safety testing, aftermarket parts are not guaranteed to perform as OEM parts.

150. For instance, in a front-end crash, the bumper plays a critical role in deployment of a vehicle's air bags. The bumper is the first structure to absorb impact, creating a series of vibrations which then alert air bag sensors to the possible need to deploy and how fast they need to deploy. Often being made of different, thinner, cheaper materials, assembled of noncontiguous sections, aftermarket bumpers do not vibrate in the same manner as OEM bumpers, if they vibrate at all, and can result in failure of the air bag system.

151. Vehicle hoods are also designed to crumple in a particular manner so as to absorb and

distribute impact energy to protect people within the passenger compartment.  Aftermarket hoods, again made of thinner, cheaper material, do not crumple in the same manner OEM parts are designed and tested to perform, thereby endangering people within the vehicle.

152.    Even aftermarket windshield glass poses a safety risk to vehicle occupants.  In a rollover crash, the windshield works to keep the vehicle roof from collapsing.  Aftermarket glass is thinner than OEM glass, and is not designed to fit a particular vehicle.   As with other aftermarket parts, replacement glass is not subject to crash testing requirements, thinner glass may shatter rather than providing protection in a rollover or may simply pop out altogether.

153.    The majority of the time, aftermarket parts simply do not fit properly.  A study conducted by the California Department of Consumer Affairs, Bureau of Automotive Repair found that four of five non-OEM crash parts tested were inferior to OEM parts.  Non-OEM parts must be modified to fit a vehicle they were supposed to fit without modification, resulting in additional labor time, the cost of which, in addition to the cost of the part itself, actually make the non-OEM part more expensive than the OEM part.  See copy of California Bureau of Automotive Repair *Repair Reporter*, Summer/Fall 2003 excerpt attached hereto as Exhibit "3."

154.    However, in the vast majority of instances, Defendant insurers refuse to pay the additional labor time to modify non-OEM parts they themselves insisted on using.

155.    Additionally, use of aftermarket or salvage parts significantly impact a vehicle's manufacturer warranty.  While federal law prohibits manufacturers from outright voiding the entirety of a vehicle's warranty due to use of aftermarket or salvaged parts, if failure of an aftermarket or salvage part causes damage to a vehicle part which is still under warranty, the warranty coverage on

the damaged part is voided and the manufacturer owes no repairs to the consumer.[3]

156.    For example, if the use of a defective aftermarket or salvaged radiator support causes damage to a vehicle's engine, the damaged engine will no longer be covered under the vehicle's warranty.

157.    However, when this is brought to the attention of insurers, insurers deny any impact upon a vehicle's warranty due to the use of aftermarket or salvaged parts.  Consumers are not advised of the limitations to their manufacturer warranty.  See, for example, USAA's Quality Replacement Parts Program brochure excerpt of FAQs, attached hereto as Exhibit "4."

158.    Insurers repeatedly and falsely state to consumers that aftermarket and salvage parts do not affect a vehicle's warranty.  This falsehood is repeated in writing, not only by omission, as in USAA's brochure, above, but affirmatively, notably by the Insurance Information Institute ("III") which has published, "Generic crash parts do not interfere with a vehicle's existing warranty and are often manufactured by the same supplier and in the same manner as OEM parts."

159.    State Farm, Allstate, GEICO, Nationwide, Liberty Mutual, USAA, American Family, AIG, Chubb (parent company of Defendant Great Northern), Erie, Grange, Kemper, Travelers, Hartford, State Auto, Farmers, Country, Secura, Horace Mann, Utica Group (parent of Defendant Founders), Westfield are all member companies of the Insurance Information Institute.[4]

160.    The Board of Directors of the Insurance Information Institution is made up of insurance company executives.  Current and former members of the board of directors include

---

[3]See Federal Trade Commission notice,
http://www.consumer.ftc.gov/articles/0138-auto-warranties-routine-maintenance

[4]http://www.iii.org/services/directory/company-categories/insurance-companies-iii-members

executives of State Farm, Allstate Farmers, GEICO, Hartford, Liberty Mutual, Nationwide, State

Auto, Travelers, USAA, AIG, Erie, American Family and Westfield.[5]

C.     Mechanical

161.    Often, collision repair involves not only damage to the body of the vehicle but also

to mechanical parts such as the engine.  In order to complete the repair, mechanical repairs are

necessary.

162.    Some shops have mechanical repair specialists on premises. When they do, a separate

hourly rate applies to work performed by mechanics.  For instance, Plaintiff S. Danihel Collision

performs mechanical work at the rate of $ 75.00 per hour.

163.    Shops which do not perform mechanical work in house sublet the job to an outside

source.  The cost of repair includes the actual cost of the mechanical repairs plus a "mark up"

ranging between twenty five and thirty five percent (25-35%) of the mechanical bill to cover the cost

of transporting the vehicle to and from the sublet location.  The mark up covers not merely the actual

costs of transportation, such as gasoline or a tow truck when needed, but also the cost of the

employee who must transport the vehicle and be diverted from in-house duties.

D.     Administrative Costs

164.    Administrative costs are those fees assessed for necessary non-repair work.  Almost

exclusively, non-repair administrative work are tasks compelled by insurers.  Insurers often require

numerous photographs be taken and transmitted electronically before approval for work will be given

---

[5]Multiple Defendants named in companion cases have also served or presently serve as members of the board of directors of III including Hanover.

but Defendant insurers refuse to pay for these tasks.

165.    Additionally, the use of junkyard or imitation parts results in lost time and expense to the Plaintiffs.  Parts which do not fit may be returned to the vendor but such returns require the Plaintiffs to pay a restocking fee, which is not reimbursed to the shop.

166.    Above restocking fees, parts must be received and inspected.  As most aftermarket and salvage parts required by the Defendant insurers are inappropriate, broken or of poor quality, they must be repackaged and returned to the seller, and new parts ordered, utilizing employee time, resources and expenditure of funds which would not be required but for the Defendant insurers stipulations.

167.    Administrative fees vary from shop to shop.  Some bill by flat fee, others by task.  But again, the Defendants refuse to pay these charges though the tasks are almost exclusively compelled by the Defendants under threat of refusing to pay for repairs.

ROLE OF DIRECT REPAIR PROGRAMS

168.    At their initiation, direct repair programs ("DRPs") were apparently intended to benefit consumers by ensuring a pre-screened pool of reputable, quality body shops existed to which customers and claimants could be referred.  Allstate is generally believed to have been at the forefront of the DRP initiative in the 1970s.

169.    In addition to Allstate, the vast majority of major insurers created DRPs over the years, including State Farm, GEICO, USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, Hartford, Erie, Westfield, American Family, Amica, Grange, Kemper, Secura, West Bend and State Auto among others.

170.    Over the course of intervening years, the emphasis of DRPs completely shifted course and direction. Defendant insurers tout their programs publicly as beneficial, time-saving and cost-saving for consumers:  One-stop shopping for collision repairs–going to a DRP shop, a consumer can take care of their claim needs, rental car needs and collision repair needs in one neat package.

171.    This continues to be the public face of direct repair programs.  The reality, however, is starkly contrary.  Instead of ensuring quality repairs, DRPs became vehicles for suppressing repair costs to the detriment of the Plaintiffs and consumers.  Insurers steer or coerce consumers to their DRP shops, again proclaiming their benefits, while knowing many DRP shops across the nation consistently and willfully fail to make safe and proper repairs.

172.    DRPs are not in and of themselves a problem.  It is the use to which the Defendants have put them, primarily over the last ten to fifteen years, which have created a national atmosphere where one industry–insurers–control and direct the entire business of a wholly separate industry–auto body collision repair shops.

173.    DRPs were originally presented to body shops generally as a mutually beneficial opportunity. In exchange for providing a "most favored nation" ("MFN") pricing clause to the sponsoring insurer, as well as preferential timing of repairs, the individual Defendants would list the body shop as a preferred provider.  This, though, was never an official part of DRP association, no actual agreement for insurers to perform anything beneficial for any shop was ever made.

174.    Over the course of years, the concessions demanded by the sponsoring insurers increased incrementally until, in the present day, insurers exert complete control over every aspect of a body shop's business.  These actions include but are not limited to, exerting economic and

market coercion to establish a "market rate" or "prevailing competitive price" labor rate established by insurers rather than competitive forces between body shops.

175.   At present, the Defendants require a shop to not only accept fixed prices on labor, fixed prices on paint and materials, fixed pricing procedures on parts, refusal to compensate or fully compensate for processes and procedures, but many compel the shop to include the DRP sponsor as an additional insured on the shop's liability insurance (even though the sponsor holds no lien or other ownership interest), compel indemnification for liability assessed to the sponsoring insurer, compel primary assumption of liability for repairs using parts provided by or insisted upon by the sponsoring insurer, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsoring insurer's will and pleasure.

176.   Some terms of DRP agreements are consistently disregarded by the sponsoring insurer when it is in their immediate financial interest.  For example, State Farm's Select Service DRP requires use of certified parts for crash-related parts such as bumper assembly and radiator supports. However, State Farm regularly and routinely writes estimates including, and will only pay for, salvaged crash-related parts of unknown provenance and without any indicia of soundness or crash worthiness.

177.   Within the last several weeks, State Farm has begun circulating a new Select Service document which includes a term permitting State Farm to disregard any term it chooses, including the use of certified crash-related parts, without any consequences to State Farm.  The new Select Service document also requires shops to relinquish all legal rights and recourse against State Farm

-35-

for all claims related to parts selected for use by State Farm and requires shops to assume all liability for all repairs, including liability resulting from use of State-Farm-mandated parts.

178.    Failure to comply with DRP terms results in a pattern of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses.  Failure to comply with any express term or failure to comply with a self-selected avoidance of a term by the sponsoring insurer (such as described immediately above) results in  either removal from the program(s) combined with improper "steering" of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing the Plaintiffs services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

179.    DRP agreements are not enforceable contracts.  They do not contain essential legal elements of an enforceable contract, most notably consideration as DRPs promise no performance of anything by the sponsoring insurer and offer nothing of value to a body shop.  All purported benefits and concessions flow from a body shop to the sponsoring insurer which undertakes no obligations of any kind in return.

180.    Nor do the sponsoring insurers treat them as enforceable contracts.  No insurer has ever sought legal redress for alleged breaches of a DRP, sponsoring insurers regularly disregard terms as they see fit when it benefits them (see above) and interpreting "most favored nation" clauses to mean labor rates and other compensation may be set by the insurance industry through combination or conspiracy rather than the ordinary definition given that term, which is the shop will provide to the DRP sponsor the best rates made available to other customers.  The insurer's

interpretation results in the tail wagging the dog.

181.    Plaintiffs do not allege any contract exists between themselves and any Defendant, individually or as a group.  If any Defendant wishes to assert the existence of a valid contract between itself and any or all Plaintiffs, they are free to do so.  However, applicable authority requires any Defendant who wishes to do so plead the existence of an express contract in their respective Answer(s) as an affirmative defense and any Defendant who so asserts bears the legal burden of proof of same, including the legal enforceability of such under the laws of the State of Illinois.

Non-DRP Shops and Defendant Insurers Without DRPs

182.    Whether or not an insurer sponsors a formal direct repair program has no effect on the behavior of the named Defendants, nor does any Plaintiffs' association with any DRP.   The Defendants collectively and through exertion of their combined market share power, enforce against non-DRP Plaintiffs, non-compliant DRP Plaintiffs and other body shops as many DRP "concessions" as they possibly can, either explicitly or by de facto substitute.

183.    Defendants who are not known to have formal DRPs at this time also enforce many DRP terms against the Plaintiffs, including but not limited to a "most favored nation" interpretation.

184.    Borrowing the concept of a "most favored nation" clause while turning it on its head, the Defendants compel acceptance of a fixed pricing structure by asserting they, as a group and with the power of a group, have the ability to set the rates the Plaintiffs are permitted to charge for their services.  The details of the price fixing structure are set out below.

185.    No law or other authority has ever been identified which permits the Defendants to set the pricing structure of the collision repair industry, nor compel them to purchase certain parts

or materials, nor determine the work which constitutes a full and safe repair. Yet that is precisely what the Defendant insurers have done, simply by imposing their collective will upon the body shop industry, and exploiting every possible financial vulnerability.

186.   The Defendants assert they are merely paying the "market rate" or "prevailing rate." However, this is a misrepresentation. "Market rate" and "prevailing rate" or "prevailing competitive rate" are terms used to describe a median or average of rates in a particular industry as they ebb and flow over both time and geography, react to market influences, innovations and advances in the field, and competition between practitioners of that trade or profession.

187.   In other words, in any other industry, an MFN or "market rate" discussion would assume the existence of a free market. Gas stations compete with each other, introducing new products they hope will appeal to the public, raising and lowering their prices, sometimes with astonishing speed, based upon the competitions' published prices, market availability of an increasingly scarce resource, government regulation and world events. A trucking company entering into an MFN agreement with a gas station would require the best price that gas station makes available to any other customer.

188.   It would be wholly inconsistent with accepted principles of a free market, the law and business term interpretation if that company decided that instead of demanding the best price available from the gas station, it banded together with nearly every other trucking company to exploit the gas stations' need for gasoline to be delivered by the trucking companies and arbitrarily decided what gas should cost for themselves. And not just at a single gas station but at every gas station in America.

189.    That is precisely what has occurred in the body shop industry, aided by the formatting of DRPs and the enormous economic power the Defendants collectively hold.

190.    The Defendants, as a concerted and agreed upon action, compel non-DRP body shops to agree to parts discounts the insurers have independently contracted with parts suppliers as required in DRP agreements.

191.    The Defendants, as a concerted and agreed upon action, simply refuse to pay more for parts than the cheapest a part can be purchased.  This is so whether or not the part is safe, appropriate, of like kind or quality, or even available.

192.    The Defendants compel the Plaintiffs to assume indemnification of them for liability arising out of repair procedures dictated by the Defendants, or parts purchases dictated by the Defendants, or product defects from the materials the Defendants dictate must be used.

193.    The Defendants, as a concerted and agreed upon action, impose fixed prices upon the services performed by the Plaintiffs to the Defendants' insureds and claimants.

194.    Whether or not a Plaintiff is associated with any DRPs does not alter this.

195.    Plaintiff Kallemeyn is not associated with any DRPs.

196.    Plaintiff Broadway Collision is not associated with any DRPs.  Broadway Collision was previously associated with State Farm's DRP.  That DRP association ended in 2013.

197.    Plaintiff Mitchell's Motors is not associated with any DRPs.

198.    Plaintiff S. Danihel Collision was associated with the State Farm DRP until 2013. S. Danihel Collision is not associated with any other DRPs.

199.    ==Plaintiff Collision Craft is not associated with any DRPs.==  Collision Craft was previously associated with the State Farm DRP.  That association ended in 2013.

200.    Plaintiff Knebel is associated with the DRPs of Defendants Progressive, Hanover, Horace Mann and Kemper.

201.    Plaintiff Quality Auto Body, Inc., is not associated with any DRPs.  Quality Auto Body was previously associated with the DRPs of State Farm, MetLife and Hanover, but those associations were discontinued in 2013, 2013, and 2010, respectively.

202.    The Defendants' actions described above are in violation of state and federal law.

## CONTROL OF THE REPAIR PROCESS

203.    Insurance companies are not body shops.  They sell insurance.  Body shops are not insurance companies.  They repair damaged vehicles.  The body shop industry does not compete with the insurance industry, nor vice versa.

204.    The Defendant insurers have officiously interjected themselves into every step and aspect of automobile collision repairs.  Although Plaintiffs' agreement to effect repairs is with the individual consumers, the Defendants require Plaintiffs to wait to begin repairs until after an agent of the responsible insurer has inspected the damaged vehicle upon threat of refusal to pay for necessary repairs or the insurer has issued its own estimate, with or without an in-person inspection

205.    All estimates prepared by the agent of all Defendants include the statement that the estimate is not an authorization to repair and supplements will not be honored without the insurer's prior approval, though repair approval is a right which belongs to consumers, not the repairer.

206.    State Farm has even told consumers a body shop has "no right" to establish the extent

of repairs needed on a vehicle, that State Farm gets to decide what repairs are performed.

207.    When hidden damage not apparent at the first inspection is discovered, all Defendants require all Plaintiffs to either wait for an agent to return to inspect the vehicle or take pictures of the additional damage and gain approval from the responsible insurer Defendant before fixing said damage, upon threat of refusal to pay for necessary repairs, even when the vehicle owner has already authorized repairs.  This requirement is written into each Defendant insurers' estimates.

208.    Although the choice of type of repair parts (OEM, aftermarket or salvage) belongs to the consumer, the Defendants require Plaintiffs to accede to their respective  written estimates specifying salvaged or aftermarket parts, even when such contradict the express direction of the vehicle owner, contradict the vehicle manufacturer recommendations or even impairs the vehicle warranty.

209.    Each Plaintiff has been informed of this "policy" by at least one representative or agent of each Defendant and will testify based upon personal knowledge.

210.    The Defendants compel or attempt to compel use of particular vendors for parts procurement.  Failure to comply with this requirement, even when compliance is not actually possible, i.e, the specified vendor does not have a particular part available, results in refusal to pay for the part actually used for the repair in full.

211.    Each Plaintiff has been informed of the "required" vendor by at least one representative or agent of each Defendant and will testify based upon personal knowledge.

212.    The Defendants limit the processes and procedures used in a given repair, even when the collision repair professional asserts a professional opinion which conflicts with the insurer

representative, who is not a collision repair professional.  Frequently, an insurer representative will agree the process or procedure is necessary for a full and safe repair but refuses compensation because "we just don't pay for that." See below for additional facts.

Plaintiffs Have No Options

_____213.___In reality, the Plaintiffs have no option but to do business with consumers for whom the named Defendants are responsible for paying for repairs.  As noted, the Defendant insurers control approximately eighty-five percent (85%) of the private passenger insurance market within the State of Illinois.  Refusing to do business with the Defendants' insureds and claimants excludes more than three-quarters of the population of potential customers within the state, a situation not feasible for a shop that wishes to stay in business.

214.    This is even more apparent when it is recalled that the vast majority of Plaintiffs' customers are insurance-paying consumers, between seventy five and ninety five percent (75-95%).  Simply excluding the claimants and insureds of the named Defendant would effectively close the Plaintiffs' door.

215.    Defendants' actions have left the Plaintiffs with no meaningful options.  Payment is presented to Plaintiffs on a "take it or leave it" basis.  Attempts to obtain better terms results in not only refusal, but threats of pecuniary harm, retaliation, boycotting, and coercion. See additional facts below.

216.    However, the very lack of options the Defendants have engineered comport with the United States Supreme Court's holding in nearly identical circumstances:  Where a group of defendants has substantial or complete control over the avenues for selling plaintiffs' products or

services, and Defendants fix prices and exert economic coercion upon plaintiffs whose only options are to submit to fixed prices or go out of business, the Defendants have violated the antitrust laws. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 29 (1947). See below.

## PRICE FIXING

### A.    Labor Rates

217.    The Defendants all assert they will pay no more than the market rate for labor in the market area.

218.    However, only one company, State Farm, conducts any sort of inquiry into body shop rates, what it terms its "surveys" to purportedly determine a labor market rate in a market area. This survey is described below.

219.    None of the other Defendants conduct any form of body shop-industry labor rate studies.[6]

### 1.    State Farm's "Market Rate" Setting Method

220.    State Farm conducts its purported survey by asking shops to fill in their individual rates for body labor, refinish labor, paint, and so forth, via an online site, State Farm's Business2Business portal, or B2B.

221.    However, State Farm does not merely collect the information provided and perform statistical or arithmetic calculations. Upon receipt of rates it unilaterally deems too high, State Farm

---

[6]Since the inception and as a result of this litigation, one or two Defendants appear to have made an effort at conducting some form of survey. However, these purported surveys have not had any discernable effect on the Defendants' group behavior.

will either contact the shop and order it to amend the survey response to a lower number it finds

acceptable or it will unilaterally alter a shop's information without the knowledge or consent of the

shop involved.

222.    Most often, though not exclusively, State Farm's orders to reduce or unilateral

reduction of rates occurs with larger shops or independent shops which operate more than one

location.  The reason for this is described below.

223.    State Farm employee John Griffin is among the State Farm personnel who have

ordered body shops, including but not limited to Plaintiff Broadway Collision, to alter survey labor

rates.

224.    When State Farm selects the first option as an initial action, the order to reduce the

rates entered on the B2B portal are accompanied by threats of removal from the DRP and/or

promises to steer business away from the non-compliant shop.

225.    Once the information has been altered to State Farm's satisfaction (whether by a shop

under duress or unilaterally without the shop's knowledge), it then performs its "half plus one" form

of math.  State Farm lists the shops in a given market (as determined by State Farm) with the highest

rates submitted at the top of the list and  the least expensive hourly rates at the bottom.

226.    This manipulation is not limited to Illinois but represents a corporate policy enacted

and enforced across the nation.  In Tennessee, State Farm has repeatedly directed Plaintiffs AAA

Collision and AAA Collision-Oakland[7] to reduce their rates because they did not conform with State

---

[7]AAA Collision and AAA Collision-Oakland are Plaintiffs in the companion case of *Brewer Body Shop, et al v. State Farm Mutual Auto. Ins. Co., et al*, Cause No. 6:14-6002, also pending before this Court.

Farm's "market rate."

227.    In Washington, State Farm created a completely false survey entry of rates for Washington Plaintiff Haury's Lake City Collision[8] in 2013/14.  Haury's did not complete a survey and had not done so since it left State Farm's DRP nearly a decade earlier.  When confronted with this false entry, State Farm stated the information had been provided by an employee of Haury's. However, Haury's does not have an hourly labor rate; it bills by the job, in the same manner as attorneys who bill by flat fee rather than hourly rate.  No Haury's employee could have provided an hourly rate because no such rate exists.

228.    Additionally, in prior litigation, documents produced in discovery established State Farm altered shop rates entered into the B2B portal.  See copy of *Dealer's Edge* article, published July 15, 2011, attached hereto as Exhibit "5."

229.    State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  State Farm then totals the number of technicians or work bays and employs its "half plus one" math.  For example, if the total number of technicians/work bays for a given area as determined by State Farm equals fifty, State Farm's magic number would be twenty-six (half fifty plus one).

230.    Beginning at the bottom of the list with the cheapest shops, State Farm then counts the number of technicians/work bays up the list until it reaches its magic number.  The rates of whichever shop this happens to fall upon is declared the "market" or "going rate."

---

[8]Haury's Lake City Collision is a Plaintiff in the companion case *Haury's Auto Body, et al v. State Farm Mutual Auto. Ins. Co., et al*, Cause No. 6:14-cv-6015, also pending before this Court.

231.    The problems with this methodology are numerous.   The rates themselves are artificially created by State Farm at the very beginning of the process.  The math does not represent any identifiable form of professionally accepted methodology, even if the numbers used in that process reflected the actual labor rates rather than the rates State Farm self selects.

232.    The method contains a built in bias towards the rates of larger shops or shops with more than one location such as multi-shop operators ("MSOs" or "chains" such as Service King, ABRA, Sterling or Caliber, all of whom are direct repair shops for multiple named Defendants) as such facilities have greater capacity, more work bays and more technicians.  As the number of work bays or technicians determines State Farm's "half plus one" results, it becomes imperative for larger shops' labor rates to conform to State Farm's predetermined outcome, which State Farm ensures they do.

233.    Additionally, the method makes no provisions for work quality, equipment, quality of personnel or any other factor.  State Farm's method does not provide a range of going rates, it produces only one.  Therefore the worst performing shop in State Farm's determined market area is paid exactly the same as the best performing shop, including direct repair shops well known to provide poor, incomplete and unsafe repairs.

234.    Finally, a State Farm employee has admitted to Plaintiffs the "market rate" is fabricated, that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" is actually "whatever State Farm wants it to be."  This employee has further admitted State Farm purposefully asserts reliance upon out-of-date information, such as labor rates "about twenty years old," entered into the "survey" long ago.

2.     Collusion by Defendants with State Farm

a.     Collusion in Labor Rate Price Fixing

235.     Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

236.     State Farm does not publish or otherwise make publicly available its "survey" results. State Farm has, in fact, made significant efforts to keep this and other internal information out of the eye of the general public, particularly consumers and the media.

237.     State Farm does not disclose or make publicly available the geographic area it determines constitutes a given "market area."

239.     State Farm can and does alter a given "market area" to further manipulate the results or to punish a particularly noncompliant shop by including it in a different market area with lower rates.

239.     State Farm does not even disclose to its claims team leaders the criteria for determining a "market area" or the criteria for changing a "market area."

240.     Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or confidential information. See, e.g., *Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v.*

*State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto.*

*Ins. Co.,* 204 F.R.D. 420 (S.D. Ind. 2001).

241.    Although none of the Defendants conduct an independent determination of market

rates, all state they will pay no more than the "market rate."

242.    All of the Defendants' "market rate" is identical to the "market rate" established by

State Farm's fabricated survey.

243.    From approximately late 2008 to the first part of 2012, State Farm's determination

of labor rates in Illinois were $46.00 per hour for body and refinish labor, and $26.00 per hour for

paint and materials.

244.    This was State Farm's "market rate" for the entire state of Illinois, paying this rate

to Plaintiffs whether located in the Chicago suburbs on a small town on the opposite side of the state

not far from the Missouri border or the north central portion of the state, not far from the Minnesota

border.

245.    All of the named Defendants paid the same "market rate," $46.00 per hour for labor

and refinish labor..

246.    During this same time period, Plaintiff Kallemeyn's posted labor rates were $48.00

per hour for body labor and refinish labor; Plaintiff Knebel's posted labor rates were $54.00 per hour

for labor and refinish labor.

247.    When State Farm changed the "market rate" in the spring of 2012 to $48.00 per hour

for body and refinish labor, the remaining named Defendants also changed their "market rate" to

$48.00 per hour.

248.    The Defendants excepting State Farm did not conduct any form of survey to determine a change in rates during this time period.

249.    The Defendants all paid this "market rate" of $48.00 per hour for body and refinish labor  until the fall of 2014.

250.    During that time period, spring 2012 to fall 2014, Plaintiff Kallemeyn's labor rates had increased to $50.00 per hour for body and refinish labor; Plaintiff Broadway Collision's labor rates had increased to $50.00 per hour for body and refinish labor.

251.    Representative or agents of each of the Defendants have stated to the Plaintiffs they could not or would not alter their "market rate" unless and until State Farm alters the "market rate," that State Farm sets the rates.

252.    These statements made to Plaintiffs are corroborated by the identical nature of the rates paid by the Defendants and their contemporaneous change in conformity with State Farm over time.

253.    This collusion is not limited to Illinois.  Explicit statements made by representatives of various Defendants, including State Farm, establish the agreement by and between the Defendant insurers is national in nature, knowing and intentional.

254.    Very tellingly, in Pennsylvania, a Progressive representative explained that body shops do not "affect pricing," the insurance companies get together to determine rates and new rates would probably be determined by a "big meeting" scheduled for April, 2015.

255.    A State Farm employee in Tennessee has admitted that State Farm sets the rates for the entire industry, that it "dictates the market," that State Farm stands for "controlling the market,"

and the other insurers follow its "lead."

256.     This same State Farm employee has admitted that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" is actually "whatever State Farm wants it to be."  This employee has further admitted State Farm purposefully asserts reliance upon out-of-date information, such as labor rates "about twenty years old," entered into the "survey" long ago.

257.     In speaking of the Louisiana Attorney General's action against State Farm, this same State Farm employee has admitted that everything in the Complaint is true, "we do all that," "every iota is the truth . . . . when you read [the complaint], it's like, 'that's us.'"

258.     Plaintiffs note the allegations and facts set forth in the Louisiana Attorney General action, *State of Louisiana, ex rel. Caldwell vs. State Farm*, formerly Cause No. 6:14-cv-6017 are essentially identical to the facts and allegations of the present Amended Complaint.[9]

259.     In Oklahoma, USAA representative Chad Turner told a body shop that USAA's rates would probably be increasing soon because the new State Farm survey results had just been circulated.

260.     In Louisiana, Tim Boudreaux of Louisiana Farm Bureau has told Louisiana Plaintiff Advanced Collision his company will only pay what State Farm pays.

261.     In Alabama, several Allstate representatives, including but not limited to Keith Eddy, have told various shops that Allstate's "market rate" will stay the same as State Farm's and will not raise until State Farm approves an increase.

---

[9]This cause has since been remanded to Louisiana state court.

262.     Another Allstate representative Forrest Odom has specifically stated, "When State Farm changes the rates, Allstate will change theirs.  State Farm is the big dog in this hunt."

263.     In a separate instance, when asked about increasing labor rates, Mr. Odom has further stated, "State Farm is the giant and they do a survey, we don't do a survey."

264.     Alabama GEICO representative Tarria Poplar was asked by Plaintiff Oak Mountain[10] when GEICO would begin paying the posted labor rates.  Ms. Poplar stated, "When State Farm starts paying the rate then GEICO will.  You know State Farm is the Big Brother in this business."

265.     Alabama GEICO representative Joe Ballinger and multiple representatives of USAA have also made similar statements.

266.     Non-Defendant Cincinnati Insurance[11] representative Derrick Hopkins was asked by Plaintiff  Oak Mountain why Cincinnati was sticking with the fixed labor rate of $48.00 per hour. Mr. Hopkins expressed regret that the rate had remained unchanged for so many years and stated, "I wish State Farm would raise the rate so we can follow."  When asked why Cincinnati had to wait for State Farm, Mr. Hopkins stated, "That's just the way it is."

267.     Despite evidence of disparate rates, disparate billing methods,  in disparate population centers over time, the named Defendants have consistently acted in a united manner to illegally fix and suppress the labor rates of body shops in Illinois generally and the Plaintiffs in particular.

268.     Collusion and agreement is apparent not only in the identical "market rates" paid by

---

[10]Oak Mountain Body Shop, LLC, is a Plaintiff in the companion case *The Only One, Inc. v. State Farm Mutual Auto. Ins. Co.*, Cause No. 6:14-cv-6009, also pending before this Court.

[11]Cincinnati is not a named Defendant in this, the Alabama Action, but it is a named defendant in multiple companion cases.

the Defendants but representatives of many named Defendants have explicitly or implicitly linked their own rates to those fixed by State Farm, and verbalized the existence of group meetings of Defendant insurers wherein labor rates are illegal fixed by the Defendant insurers.  Again, this is not confined to Illinois but occurs nationwide.

b.      Collusion in Market Area Determination

269.    As noted above, State Farm also purports to establish market rates based upon "market area."  This would presumably account for variations across distance, metropolitan areas as well as discrete areas of a given state, such as Illinois.

270.    Regardless of the size of the shop, the population center and demonstrable difference in rates actually charged by the Plaintiffs across the State of Illinois, State Farm determined the "market rate" in Illinois was $46.00 per hour (body and refinish) from at least 2009 to early 2012.

271.    The remaining Defendant insurers also paid $46.00 per hour across the State of Illinois, despite performing no survey of their own..

272.    Despite there being demonstrable differences in the rates charged at the varying locations in Illinois, the Defendants all assert the "market rate" in the "market area" was not only identical, it was identical to that of State Farm.

273.    This information could only have been provided by State Farm to its ostensible competitors. The same data a State Farm employee has admitted is manufactured to suit State Farm.

274.    The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility.  This is even more obvious when one considers the possibility of reaching an identical conclusion to that

of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

### 3. Intimidation and Coercion of Plaintiff Shops Threatening Anti-Trust Allegations

275.   Over the course of years, in addition to manufacturing a "market rate," the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates.

276.   Shops are frequently told they are the only shop trying to raise their rates, therefore the posted rates do not conform with "market rates" and the Defendants refuse to pay the posted rates.

277.   Representatives of the Defendant insurers have made statements about non-conforming rates to the Plaintiffs.  Plaintiffs have personal knowledge of these statements and can testify to the same.

278.   Defendants have threatened Plaintiff shops and others that if they discuss labor rates with each other, they will be price fixing and breaking the law.  Statements to this effect have been made by Defendants to the Plaintiffs and announced at meetings of the Southeastern Auto Collision Association by various representatives of the insurance industry.

279.   Plaintiffs have personal knowledge of these statements and can testify to the same.

280.   Again, this has been a national effort.  At various times, members of the Defendant insurers have threatened antitrust lawsuits.  The threats have been so frequent that the Mississippi Collision Repair Association frequently requests the attendance of a witness from the Mississippi

Attorney General's office at association meetings so as to provide independent verification that no price fixing or collusion occurs at those meetings.

281.    Plaintiffs believe the forgoing facts are sufficient to establish the probability that discovery will adduce additional information showing the Defendants have intentionally acted in concert, combination and by agreement to fix and suppress the labor rates of the body shop industry in Illinois.

B.    Repair Processes and Procedures

282.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

283.    The Defendant insurers have over the course of years exerted their combined market share power to refuse payment or full payment for repair processes and procedures required to return vehicles to pre-accident condition.

284.    This failure constitutes a selective failure by Defendants to follow collision repair industry standards for auto repairs, while simultaneously relying upon these same standards when they choose.

285.    Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)    ADP or Audatex;

b)    CCC; and

-54-

c)    Mitchell.

286.    These databases provide software and average costs associated with particularized types of repairs to create estimates. The estimates generated by these databases include the ordinary and customary repair procedures, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition. These databases and the estimates they generate are accepted within the body shop industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

287.    By default, database estimates are underestimates of actual repair times and materials. The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle. Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, which can substantially affect real world repair procedures required, repair times and necessary materials. It is, for instance, much faster and easier to remove an undamaged door from an undamaged vehicle than it is to remove a wrecked door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

288.    The databases also provide standards for billing, defining what procedures are considered included operations–procedures billed "in bulk" as part and parcel of a repair–as well as defining not included operations–procedures billed separately.

289.    Historically, these procedure databases were printed and distributed in hard copy to

subscribers.  Throughout the industry, they are referred to as "p-pages."

290.    Although now housed in electronic form as computer databases, they are still popularly referred to as "p-pages."

291.    The databases, or p-pages, are essentially identical in their content.  Choice as to which one will be used is generally based upon price point and personal preference.

292.    All of the Plaintiffs subscribe to one or more of these databases and use the same to generate estimates for individual repairs.

293.    All of the Defendants subscribe to one or more of these databases and use the same to generate estimates for individual repairs.  Where a purportedly independent appraiser is hired by a Defendant, rather than an employee of the Defendant, the independent appraiser uses one or more of these three databases to generate estimates for individual repairs.

294.    Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, either through their own consistent use of these databases or more explicitly, as State Farm has done.

295.    As much as twenty years ago, State Farm assured the body shop industry it does and would continue to abide by the standard operations of the "p-pages."  Sitting on a panel discussion at the 1994 National Autobody Congress and Exposition, State Farm speaker Gerry Westerfield answered a question of how to handle State Farm adjusters who refused to pay for standard "p-page" operations with the following:

296.    "If a State Farm representative comes to your shop and says, 'We don't pay for that, it's company policy,' take it from me, we don't have that policy.  . . .  So tell them, 'I know your

policy and that's not it.  Who's your supervisor?'"

297.    Despite public endorsement and daily use  of the databases, the Defendants have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and processes in compliance with the industry-accepted databases.

298.    In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

299.    Alternatively, the Defendants will refuse to make full payment for processes and procedures required to return a vehicle to pre-accident condition.

300.    A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "6."

301.    At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

302.    Representatives of the Defendants have all made verbal statements to the Plaintiffs that particular processes, procedures or billed materials will not be paid for purported failure to comply with the p-page databases.

303.    Plaintiffs have personal knowledge of these statements and will testify to the same for each Defendant named in this paragraph.

304.    Defendant insurers will alter the database estimates, unilaterally reducing either labor time or materials needed.  Manual changes to database standards are automatically marked by the program either by underlining or an asterisk so there is no question when a Defendant has altered database information

305.    Defendant insurers' only reasons  for reducing or deleting necessary repairs on their estimates are, "We don't pay for that," or "That isn't reasonable or customary in your market area."

306.    Notably, these excuses have nothing to do with necessary repairs, whether a process, procedure or material is required to repair a vehicle to pre-accident condition, or the length of time to complete a particular repair, or even a question as to whether the work was actually performed and everything to do with the insurer Defendants' simple refusal to pay for full, complete and safe repairs.

307.    When pressed by Plaintiffs to explain why a necessary operation will not be paid for, representatives of the Defendants will admit the operation is required but that the Defendant insurer requires the estimate to be written without its inclusion.

308.    Even when a shop provides information or documentation that a process or procedure is required, either due to the manufacturer's standards for safe repairs or the databases, the Defendant insurers refuse to authorize or pay for those processes or procedures.

309.    This is done even when the insurer publishes it will follow such guidelines, including collision repair industry standards, manufacturer's recommendations and I-CAR[12] recommendations,

---

[12]I-CAR, Inter-Industry Conference on Auto Collision Repair, conducts instruction classes for repair professionals and other industry professionals leading to certification of repairers as competent to conduct repairs in multiple areas, such (but certainly not limited to) as aluminum repair.  I-CAR platinum certification, the highest that is awarded, is very highly regarded.

when writing repair estimates.

310.    Processes and procedures are routinely excluded by the Defendant insurers, though when performed, they are necessary to return a vehicle to pre-accident condition, by making the false statement the excluded process or procedure is an included operation.  The databases specifically note these procedures are <u>not</u> included in other repairs or refinish procedures and thus must be billed and paid as separate items.

311.    Examples of the foregoing include the following:

•    Feather, prime and block: This procedure is a refinish operation that completes bodywork repair from 150 grit smoothness to the condition of a new undamaged panel.  While this procedure is not required on every repair, when it is performed, all three databases clearly state it is <u>not</u> an included operation and it is a refinish operation.

312.    The Defendant insurers generally do not dispute the necessity of feather, prime and block when a repair calls for it.  Rather, the insurer Defendants have historically consistently refused to pay for this procedure in its entirety to  the Plaintiffs on the ground that it was an included body labor operation.

313.    However, it is not an included operation.  As noted, each of the databases utilized by the Defendant insurers state as such.

314.    In other instances, the Defendants will tell Plaintiffs each is the only one to insist on payment for necessary work performed.  The falseness of these statements is apparent as each Plaintiff has sought payment for the work performed, notified the respective Defendants and the

Defendants were fully aware each was not "the only one."

- Denib and finesse (also known as color sand and buff or color sand and polish): This refinish procedure is described above. All three databases denote this procedure, when required, is <u>not</u> an included operation.

315.    Most of the Defendant insurers simply leave this procedure off their estimates and refuse to acknowledge Plaintiff supplements requesting payment for same.

316.    In other instances, Defendants will acknowledge a procedure is both necessary to return a vehicle to pre-accident condition and follows the protocols of the p-pages but simply refuses to compensate for it.  For example, Liberty Mutual briefly aired a commercial as part of its "Lifetime Repairs Guaranteed" advertising campaign discussing the importance of blending, the process ensuring the paint on repaired/replaced panels match adjacent panels.  In the commercial, an actress discusses failed paint matching following a repair then goes on to state Liberty Mutual's Lifetime Guarantee takes care of this problem.  However, this is inconsistent with Liberty Mutual's refusal to pay fully for blending, among other matching procedures, and the commercial was pulled, not only from airing on television but removed from all outlets.

317.    Plaintiffs have personal knowledge of these statements made by the Defendants' representatives or agents and are able to testify to the same.

318.    Plaintiffs assert discovery will produce additional facts  to establish the universe of procedures and processes the Defendants refuse to pay for, misrepresent as "included operations," and the other misrepresentations and/or false bases for refusing to pay for work performed.

3.    <u>Paint and Materials</u>

319.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

320.    As described above, traditionally, paint and materials have been compensated at an hourly rate.  Separate and apart from paint labor rates, paint and materials rates were intended to compensate shops for the cost of paint and materials used in a repair.

321.    However, as also described above, contemporary vehicle finishes and the materials necessary to complete repairs have costs which have outpaced the traditional method.  While it is inarguable  materials must be expended to repair automobiles, the Defendants simply refuse to pay for them or pay fully the paint and materials costs submitted, asserting additional costs are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair operations.

322.    All of the Defendants assert the paint and material rate they pay is the "going rate" or "market rates" in the area.

323.    However, over the last few years, many Plaintiffs have begun using a PMC (described above), which provides a detailed invoice of paint and materials expended for each repair.

324.    The Defendants, however, generally refuse to pay PMC invoices.

325.    Every single Defendant continues to estimate and pay based upon the antiquated method of an hourly rate for paint and materials.

326.    Despite there being demonstrable differences in the rates charged, the named

Defendants all assert the "market rate" in the "market area" was not only less than publicly posted

rates but was exactly the same as the rate State Farm concluded was the "market rate" based upon

its unpublished "survey."

327.    Representatives of the Defendants have all made verbal statements to the Plaintiffs

that full compensation for paint and materials will not be paid, whether by honoring the Plaintiffs'

posted paint and materials hourly rate or refusing to honor the very precise PMC invoices.

328.    Plaintiffs have personal knowledge of these statements and will testify to the same

for each Defendant named in this paragraph.

329.    Plaintiffs assert discovery will produce additional facts and evidence supporting the

allegations of this Amended Complaint.

4.      Parts

330.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to

convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity

or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way

that each defendant is having the allegations made about it individually.

331.    Numerous reliable sources have found aftermarket parts inferior to OEM parts.  As

noted above the California Bureau of Automotive Repair  found aftermarket parts inferior and the

majority of them simply did not fit. See Exhibit "3."

332.    Ford Motor Company has conducted crash tests comparing OEM crash part

performance to aftermarket crash part performance.  The results, which are publicly available, found

that not only did aftermarket parts fail to perform at the same level, but repair costs on vehicles fitted

with aftermarket parts were often double that of OEM parts.[13]

333.    Consumer Reports reached the same conclusion, a report also publicly available.[14]

334.    Despite the fact that aftermarket and salvage parts have significant issues with safety, fit, form and function, the named Defendants insist on their use as the least expensive alternative.

335.    Safety issues are particularly paramount in replacing crash related parts.  Salvaged parts are not subject to any safety testing requirements or regulations.  They are, by definition, parts removed from other vehicles, almost exclusively vehicles which have already been wrecked and most frequently vehicles which have been damaged so badly as to be declared total losses.

336.    State Farm has recognized the safety issues associated with crash related parts by writing into its DRP language that "the following crash related parts, when subject to certification standards developed by an organization approved by State Farm, will be certified unless requested by the vehicle owner:

-bumper components

-lighting components

-radiator supports/tie bars and associated mounting components

-outer sheet metal and plastic/composite parts."

---

[13]See, e.g., https://www.youtube.com/watch?v=LPly9QFteso

[14]See, e.g.,
http://www.consumerreports.org/cro/news/2010/08/video-knock-off-bumper-part-explodes-in-crash-test/index.htm

337.    Despite this, State Farm regularly and routinely writes estimates compelling use of salvaged bumper components, lighting components, radiator supports for repairs conducted at Plaintiffs' shops.  Examples include:

- Remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies

- Used side panels (salvaged)

- Salvaged radiator panel, crossmember

- "Recycled" (salvaged) headlamp assembly and side marker lens

- Salvaged headlamp panel

- Salvaged taillamp assembly

- Salvaged radiator supports

338.    Other insurers have publicly recognized the safety issues with using crash-related salvaged and aftermarket parts. Defendant GEICO announced in January, 2010, it would no longer specify aftermarket parts for bumper reinforcements, brackets or energy absorbers due specifically to safety concerns.

339.    However, despite this, GEICO continues to specify aftermarket bumper parts such as brackets and supports.

340.    Farmers spokesperson Kitty Miller has publicly stated, "Farmers does not use salvage parts to replace axles, suspensions, or transmissions.  Most salvage parts are external sheet-metal parts."

341.    This is not a truthful statement.  The Farmers companies regularly require use of salvaged crash related parts including radiator supports, radiator assemblies, hoods,  bumper assemblies, and fender assemblies in estimates written for repairs at Plaintiffs' shops.

342.    In Alabama, Farmers representative Sarah Curtis has stated Farmers requires use of aftermarket and salvaged parts on all repairs and Farmers will only "approve" use of OEM parts if no aftermarket or salvaged parts are available at all.

343.    Estimates prepared by the Defendant insurers include regular and routine use of salvaged and aftermarket crash-related parts.

344.    The insurance-industry wide practice of insisting on aftermarket parts, which are materially inferior and simply do not fit, or salvaged parts of dubious or unknown provenance, history and prior damage places Plaintiffs in the untenable position of either performing a repair with unsafe parts or performing safe repairs at their own expense.

345.    Despite the well-publicized advertising statements of insurers such as State Farm, GEICO, Liberty Mutual and Allstate, among others, that "guarantee" their repairs for as long as the consumer owns the repaired vehicle, these companies' own documentation disclaims this purported guarantee specifically with respect to aftermarket and salvaged parts.

346.    The estimates prepared by each Defendant insurer disclaim any warranties or guarantees for the parts they select and insist be used in a given repair.

347.    The estimates prepared by each Defendant state that the manufacturer or distributer of the part is responsible for any warranties that may apply.

348.    The immediate cost to the Plaintiffs is the loss of revenue and time lost in modifying

aftermarket parts to fit, which the Defendants refuse to pay.  With salvage parts, the shop must clean and often repair the parts prior to use, when they are usable, and that is also time and labor which the Defendant insurers refuse to compensate the Plaintiffs.

349.    As found by the California Bureau of Automotive Repairs, insurers regularly refuse to compensate shops for the time and labor required to modify aftermarket and salvage parts.  See Exhibit "3."

350.    The long term outcome of the limiting language used by the Defendant insurers is the body shops shoulder the liability burden for failure or inadequacy of parts they had no voice in choosing.

351.    For shops which do remain associated with direct repair programs, the threat and potential cost is even greater.  Most DRP terms, such as those of State Farm, USAA, and Progressive, require the shop to not only maintain an extensive liability policy with the DRP sponsor as a named insured, (for which the shop bears sole premium payment responsibility) but also contain language requiring the shop to assume liability for any problems arising from parts selection and/or usage, and agree to indemnify the sponsoring insurer in the event the insurer is found liable for its own action with regard to parts.

352.    Again, in the face of the combined market power exerted by the Defendants and their unified insistence on use of aftermarket or salvage parts, the only recourse a shop has is to purchase appropriate parts and work at a loss on each such repair, thus damaging the Plaintiffs.

353.    Plaintiffs aver upon their own knowledge that each named Defendant has required the use of improper parts for repairs, refused to compensate them for parts costs which exceed their

own cost determination.

## STEERING

354.    Within the body shop and insurance industry, "steering" is the term used to describe the practice of insurers of coercing or otherwise convincing a consumer to withhold patronage from a disfavored repair shop for failing to comply with fixed prices or insisting on making full, complete and safe repairs.

355.    Steering generally takes the form of an insurer relaying false or misleading information to a consumer after the consumer has identified a noncompliant target shop as the repair facility the consumer wants to perform repairs.

356.    Defendant insurers will also steer using threats of economic consequences to the consumer if they persist in using the shop of their choice.

357.    Regardless of which insurer is involved, the Defendants' insurance representative ordinarily provides the same list of false or misleading "information" to consumers after they have selected one of the Plaintiffs' shops as their choice of repair facility.  Examples of these statements include but are not limited to the following:

•       The consumer is required to take their vehicle to an approved shop for repairs;

•       The selected shop is not on the insurer's preferred list;

•       The insurer has received complaints about the quality of the shop's work;

•       If the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car time and have to pay for a rental out of their

own pocket;

• The selected shop charges too much or "overcharges" and the consumer will have to pay the difference;

• The insurer has received complaints about that particular shop from other consumers.

• The consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility the consumer has identified as the repair facility of their choice.

• The insurer will only provide a guarantee on repairs performed at its preferred shops.

358.   With respect to the statement that a consumer must visit a preferred shop for an estimate before proceeding to the shop of choice for repair, GEICO appears to be the most aggressive.   GEICO claims handling documents refer to this as "capture and retention."   If the GEICO employee handling the claim is successful at directing a vehicle to one of its direct repair shops for an estimate, the file is marked as a successful "capture."   One method of completing a successful "capture" is telling consumers they are required to have an estimate at a "preferred" shop before the consumer is permitted to take their vehicle to the repair shop of choice.

359.   If GEICO successfully compels repairs at the facility which "captured" the vehicle, this is designated a successful "retention."   GEICO internal documents repeatedly urge employees to capture and retain, directly tying such success to  increased company profits and increased profit-sharing bonuses for employees.

360.   The degree of steering has varied over the years but, upon information and belief, the hard core steering used by the Defendants against the Plaintiffs appears to have commenced

approximately ten years ago, continuing to the present day.

361.    Examples of steering include but are not limited to:

Allied Property and Casualty

362.    K. Penteris took her vehicle to Plaintiff Kallemeyn for repairs.  After being notified of this, Allied representative Glen Lockchow contacted Ms. Penteris and told her Kallemeyn was a problem shop and she would probably have to pay thousands out of pocket for repairs.  Because of these statements, Ms. Penteris removed her vehicle from Kallemeyn and repairs were conducted at a preferred shop.

State Farm

363.    B. Bracken expressed to her State Farm agent she was going to Plaintiff Knebel to repair her vehicle.  Ms. Bracken was told she need to go to a preferred shop for an estimate first. When Ms. Bracken did not bring her vehicle to Knebel, the shop called to find out why.  Ms. Bracken had been told by State Farm there would be warranty on the repairs if she had Knebel repair the car but there would be if she went to the preferred shop.

364.    K.M. was told by State Farm that if she took her vehicle to Knebel, the repairs would take a long time, that a preferred shop would work faster and that Knebel was not on "the list." K.M.'s family member had previously had repairs performed at Knebel and was very happy with the result but State Farm's statements deterred her from taking her vehicle to Knebel.

365.    A. Dyson took her vehicle to Plaintiff Quality Collision for repairs.  After being told the vehicle was at Collision, State Farm told Ms. Dyson Quality was not on their list.  Ms. Dyson repeated Quality was going to fix her car.  State Farm then told Ms. Dyson a preferred shop could

repair her car faster.  Ms. Dyson repeated again her vehicle was going to be repaired at Quality.  State Farm told Ms. Dyson if she left her car at Quality, it would be five days before an adjuster could come out to see it.  Ms. Dyson repeated again she was going to have the car fixed at Quality.

366.    O. Vargas took his vehicle to Plaintiff Collision Craft for repairs.  While awaiting repairs, Mr. Vargas was contacted by State Farm and given a list of shops he could take his car to, though he had already delivered it to Collision Craft.  Mr. Vargas said that based on the call, he was afraid State Farm would make problems with the claim and he took his vehicle to a shop on State Farm's list.

367.    A.F. was told by State Farm that repairs at Knebel would take too long and he should go to a preferred shop instead.  As a result, A.F. took his vehicle to a State Farm DRP.

368.    D.H. broke a window in his vehicle and notified State Farm.  D.H. said he would be going  to Knebel.  State Farm told D.H. it would take several days for an appraiser to view the vehicle if he took it to Knebel but he could go to a preferred shop.  As a result, D.H. took his vehicle to another shop since he could not drive around for days with a broken window and could not wait the "several days" it would take for State Farm to show up at his choice of repair shop.

369.    Consumer J. Engelbrecht notified State Farm she was taking her vehicle to Plaintiff Quality Collision for repairs.  State Farm told Ms. Engelbrecht she should go to another shop because of Quality's "rating."  At the time, Quality was associated with State Farm's DRP.  When questioned, State Farm told Quality Ms. Engelbrecht was directed to another State Farm shop because Quality was not "cost effective."

Liberty Mutual

370.    After notifying Liberty Mutual he was taking his vehicle to Plaintiff Collision Craft, Liberty Mutual told J. Pietrowaski that Collision Craft was not on their list, that going to a preferred shop would be faster as they could pay the shop directly and that he was required to take his vehicle to a preferred shop for an estimate before he could go to the shop of choice for repairs.  Although unsuccessful, Mr. Pietrowaski felt substantially pressured by Liberty Mutual to change his choice of repair shop.

Founders

371.    After notifying Defendant Founders she was taking her vehicle to Plaintiff Collision Craft, Founders told D. Bartus she would have to go to a preferred shop for an estimate before she could go to the shop of her choice for repairs.  Though it was unsuccessful, Ms. Bartus felt the instructions were meant to pressure her into changing her choice of repair shop.

Progressive

372.    After identifying Plaintiff Collision Craft as her choice of repair shop to Progressive, I. Lopez was told Collision Craft was not on their list and she would have to go to preferred shop for an estimate before she was permitted to go to the shop of her choice for repairs.

Allstate

373.    G. Timm notified Allstate of a claim and that her car would be repaired at Plaintiff Quality Collision.  Allstate told Ms. Timm it would only pay Quality what it would pay one of its preferred shops and she would have to pay out of pocket.  Ms. Timm left her vehicle at Quality.

<u>American Heartland</u>

374.    Claim number 1004074342–American Heartland told consumer it would only pay its own rate, and she would have to pay the difference out of pocket, several thousand dollars, if she left her vehicle at Plaintiff Quality Collision.  Consumer elected to remain with Quality as it was her choice of repair shop.

375.    In each of these examples, the vehicle owner had clearly identified a Plaintiff as the repair shop the consumer wanted to deal with, or had already taken their vehicle to one of Plaintiffs' shops.  In each instance, a Defendant insurer directly intervened in the business relationship (commenced or intended) through false statements, misrepresentations, implications of unethical conduct by the Plaintiff or  played upon the financial vulnerability of the consumer.

376.    Because of the nature of such things, the vast majority of evidence of successful steering lies solely within the control and custody of the Defendants themselves.  There is, however, sufficient evidence of both successful and unsuccessful steering efforts by the Defendants to reasonably conclude discovery will produce additional evidence of Defendants' actions.

<u>Defendants' Steering Is Malicious, Punitive in Nature and Intentional</u>

377.    The punitive and malicious nature of Defendants' interference is exemplified by the failed steering instances described above rather than the successful ones.  In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions.

378.    The outcome was the same–each Defendant paid only what it chose to pay regardless of the actual cost of repairs and whether or not the payment provided for full, complete and safe repairs.

379.    Each Defendant paid only what it would have paid a direct repair or cost-compliant shop.  As such, steering becomes a financially pointless endeavor and does not further a demonstrably legitimate interest of the Defendants.  If each Defendant refuses to pay the full cost of repairs, regardless of where the repairs are performed, steering customers away from Plaintiffs' businesses can only be performed as a deliberate method to punish through improper means and attempts to compel compliance through financial coercion.

380.    Additional evidence of malice is the misrepresentation to consumers that certain difficulties attributed to Plaintiffs are actually and solely the result of the Defendant insurers' own deliberate choices.  The statement that repairs will take longer at a Plaintiff shop is not the result of the shop taking longer to complete a repair but a Defendant insurer's decision to delay every part of the repair.

381.    This usually commences at the beginning of the process where the Defendant insurer will delay sending a representative to the shop to perform an initial evaluation but threatens the shop that if work begins before they inspect, payment for repairs will be withheld.

382.    Quite often a Defendant insurer will tell both the customer and the shop an estimator will be sent, but days or weeks will pass, calls are not returned and when someone finally answers the phone, will again assure all concerned an estimator is being dispatched, again with no result. Only after considerable time has passed will a representative arrive for the initial evaluation, often

claiming the repair had "just been assigned."

383.    On average, the Defendant insurers take between three and eleven days to appear at Plaintiffs' shops to perform an initial estimate.

384.    Even where initial estimates are performed by Defendants in a relatively timely manner, or the Defendant insurer has successfully deceived a consumer into believing they are required to visit a preferred shop for an estimate prior to going to the shop of choice for repairs, repairs at the Plaintiffs' shops are delayed by the Defendant insurers by consistently refusing to address supplements, frequently telling the Plaintiffs and consumers that supplements were never submitted when they were.

385.    Even after acknowledging a supplement has been sent, the Defendant insurer will refuse to allow the additional work to commence until an in-person inspection of the supplemental work requested has been made or additional photographs submitted for review.  As noted above, all of the Defendants require a shop to obtain permission from them before performing work identified in supplements, though the choice and authority rests with the consumer, not the insurer.

386.    Also reprehensible are the Defendants' assertions that Plaintiffs' work cannot be guaranteed but if the consumer goes to one of their network or preferred shops, the insurer will guarantee the work.

387.    This is substantially misleading for three reasons.  First, no insurance company and certainly none of the named Defendants performs any repair work.  Therefore there is nothing for them to guarantee and asserting to Plaintiffs' customers and potential customers they will guarantee the work is both misleading and inaccurate.  As phrased, Defendants' guarantee assertions

reasonably lead consumers to believe the repairs are guaranteed by the insurer, which they are not.

388.    As noted, each Defendant insurer specifically disclaims any warranty for repairs on the written estimates they or their representative prepares.

389.    Third, Defendant insurers' statements mislead Plaintiffs' customer and potential customers into assuming Plaintiffs' do not guarantee their own work.  Were this not the intent, to lead listeners to this conclusion, there would be no effect or gain to the Defendant insurers in telling consumers that work done at a network/preferred shop would lead to a guarantee, coupled with disavowal of guarantees at the Plaintiffs' shops.

390.    Again, steering is not limited to Alabama.  Steering, performed for the purpose of harming shops who refuse to comply with fixed prices, is a national effort conducted by the Defendants across the country.

391.    Evidence set out in another case, *Price's Collision Center, LLC v. Progressive Hawaii Insurance Company*, Cause No. 12-873, pending in the Middle District of Tennessee is persuasive on this issue.  Mr. David Edwards, who was a long-term employee of Progressive Hawaii in the auto claims area, submitted an affidavit testifying Progressive **does** target specific shops for punishment.  Progressive's efforts include making derogatory statements about the body shop to consumers regarding the quality of work performed by the shop.

392.    Progressive would also deliberately refuse to pay legitimate repair costs when it was unsuccessful at steering customers away to preferred shops.  Progressive also exerted economic pressure upon consumers, telling them they would have to pay extra for going to the shop of their choice, but if the consumer had gone to a network shop, they would not have to pay.  See copy of

affidavit of David Edwards attached hereto as Exhibit "7."

393.    Progressive Hawaii, the subject of Mr. Edwards' affidavit, is not a named defendant in this action but other Progressive entities are, all of whom the Plaintiffs assert have acted in the same manner as set out in Mr. Edwards' affidavit and described above in this pleading.

394.    Additionally, a State Farm employee has admitted to Parker Auto Body, Inc., lead plaintiff in the companion case of *Parker Auto Body, Inc. v. 21st Century Centennial Ins. Co.*,[15] that it is State Farm's goal to drive independent body shops out of business, to turn all repair business over to MSOs who comply with fixed prices.

395.    Apparently consistent with this national and agreed upon goal, it would appear State Farm upper management is actively encouraging steering.  Estimatics management Richie Gray has apparently been told by his superiors that steering is perfectly legal in Louisiana, which it is not.

396.    No legitimate business interest of any of the Defendant insurers allows them to defame the Plaintiffs with falsehoods, accuse the Plaintiffs of misdeeds and malfeasance which is solely attributable to the insurers' own actions, or financially punish a shop when the cost of their own actions and inactions becomes more than they wish to pay.

397.    These actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

---

[15] *Parker Auto Body, Inc., et al v. 21st Century Centennial Ins. Co.*, et al, Cause No.  6:14-cv-310, is also pending before this Court.

## Group Boycotting by the Defendants

_____398.___Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

399.   As noted above, it is generally well accepted by the courts that insurers exert an enormous amount of influence over where consumers take damaged vehicles for repairs.

400.   Insurance-paying customers account for between seventy-five and ninety-five percent of a given Plaintiffs' annual business.  Given these proportions, the effect of Defendants' steering is dramatic.  The effectiveness of steering is shown in the numbers.

401.   Plaintiff Broadway Collision disassociated from State Farm's DRP in 2013.  After disassociating from the DRP, Broadway's State Farm-paying customers decreased by sixty percent (60%).

402.   Not only did Broadway's State Farm-paying customers decrease dramatically, so did many others:

• After disassociating from State Farm's DRP, Broadway's Progressive-paying customers dropped by 50%.

• After disassociating from State Farm's DRP, Broadway's USAA-paying customers dropped by 50%.

- After disassociating from State Farm's DRP, Broadway's American Family-paying customers dropped by 33%.

- After disassociating from State Farm's DRP, Allstate-paying customers dropped by 10%.

403.   Plaintiff Broadway was never associated with the DRPs of Progressive, USAA, American Family or Allstate.  Nonetheless, these insurers began steering customers away from Broadway.

404.   In the absence of some notice by State Farm to the other insurers that Plaintiff Broadway was no longer "protected," the sudden onset of steering by insurers who had no reason to engage in defamatory actions prior to the disassociation makes no sense.  Overall, Broadway lost nearly 35% of all its business after leaving State Farm's direct repair program, which was the only factor which changed at Broadway.

405.   Disassociation from a DRP is not the only "trigger" for group boycotting by the Defendants.  It is, however, one of the most obvious.

406.   The vast majority of specific boycotting events are within the sole possession and control of the Defendants, either maintained in claim diary entries made by Defendant representatives or the recorded telephone conversations between the Defendants and their insureds and claimants when claims are made or discussed.  Unless a consumer returns to a Plaintiff's shop to report they were steered away from doing business with a Plaintiff,  the Plaintiffs cannot know the event occurred.  A complete recitation of every event is therefore not possible.

407.   However, Plaintiffs can and have asserted specific, direct evidence of instances of

steering, both successful and unsuccessful, and thus boycotting, to raise a more than reasonable probability that Defendants do engage in the behavior alleged.  Plaintiffs have also produced circumstantial evidence in the form of inexplicable sudden reductions in their consumer base from multiple Defendants' insureds and claimants which can be tied to at least one specific event, such as disassociating from a DRP.  Individually, these facts provide more than sufficient probability that discovery will produce additional facts in support of Plaintiffs' claims.

408.    Defendants actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

<u>Willful Misconduct in Concerted Action by Defendants to Boycott</u>

409.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

410.    Steering against noncompliant shops is not limited to retaliation by insurers whose DRPs a Plaintiff shop has left.  The Defendants share this information amongst and between themselves and steer business away from noncompliant shops as a group.

411.    Noncompliant shops are specifically targeted by the group of Defendant insurers. See, e.g., Exhibit "7."

412.    Defendants are fully aware of the effect of their boycotting and State Farm, at a minimum, has admitted to the intention to drive independent body shops out of business so as to

consolidate repairs at cost-compliant MSOs.

413.     The only reasonable conclusion from these facts is the named Defendants shared information about and specifically targeted as a group the particular shops who refused to comply with Defendants' fixed pricing structures, parts procurement rules and general belief the body shops should simply be quiet and do as they are told by the insurance industry.

414.     Given the common nature of the false statements made by numerous Defendants, it is also only rational to conclude the high probability of prior agreement as to the most effective statements to make to successfully steer customers away from the targeted shops.

415.     The Defendants collectively control the vast majority of the market share within the State of Illinois.  Group boycotting by the Defendants substantially impairs the ability of Plaintiffs to engage in their lawful profession.

416.     As the majority of insured vehicles are under the influence of the Defendants and the Plaintiffs derive between seventy five and ninety five percent (75-95%) of their business from the Defendants' insureds and claimants, it is simply not economically viable for Plaintiffs to simply refuse to accept insurance-paying customers.

417.     Significantly, none of the Defendant insurers ever actually identified a single instance of wrongdoing or malfeasance by any of the Plaintiffs they were defaming in the course of their group boycotting, not even with an example that omitted personally identifiable information.  They merely stated or implied bad acts were occurring.

418.     The statements described above made by the Defendant insurers were solely to interfere in the business relationship, established or prospective, of the Plaintiffs.

419.    Defendants' actions were intentional, coordinated, relied upon shared information and utilized common methods and content.

420.    Based on known facts, Plaintiffs assert discovery will adduce additional evidence of coordinated boycotting by the Defendants.

## OPPORTUNITIES FOR DEFENDANTS TO CONSPIRE

421.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

422.    Opportunities for individuals sufficiently high enough within the Defendants' corporate structure to make or influence substantive decisions exist in abundance.

A.    Trade Associations

423.   Currently available documentation establishes that every national insurer and the vast majority of regional insurers belong to at least one of the three major insurance industry trade associations:

• American Insurance Association (AIA) : Defendants The Hartford, American Family, Safeco, Travelers, United Services Automobile Association, USAA, AIG, Great Northern (through its parent company Chubb) and Farmers  are all members of the AIA. In addition to general membership, from time to time over the course of at least ten years, Defendants, Safeco, the Hartford, Travelers, Farmers and USAA  have all served in positions of authority within the AIA, including the AIA Board.

424.    Upon information and belief, the Grange Defendants are or have been members of AIA.

•       The Property Casualty Insurer Association of America (PCI): Defendants Allstate, Encompass and eSurance (through their mutual parent company Allstate), GEICO, Liberty Mutual, Progressive, Country, MetLife, Amica, Dairyland (through its parent company Sentry), Erie, Founders (through its parent/affiliate Utica), Kemper, West Bend, Westfield and State Auto are all members of PCI. In addition to general membership, from time to time over the course of at least ten years, these Defendants have all served in positions of authority within the PCI, including the PCI Board.

425.    Upon information and belief, Defendants Horace Mann and Safeway are or have been members of PCI.

•       The National Association of Mutual Insurance Companies (NAMIC): Defendants Nationwide, Auto-Owners, American National (through its parent company Western National), Secura and State Farm are members of NAMIC. In addition to general membership, Nationwide, Auto-Owners, and State Farm have, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

426.    The affiliations of Defendants First Acceptance, Affirmative, Allied, American Access, American Bankers, American Heartland, Apollo, Delphi, Safe Auto, Safeway and Unique are not presently confirmed. However, Plaintiffs anticipate discovery will disclose associations to which these Defendants belong, if any, as the three associations above state their combined

membership is in excess of 2,600 insurance companies.

427.    The members of the companies representing these Defendants on the respective boards, in  positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

428.    For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI.  Others who have served over the years include but are not limited to Liberty Mutual's former chairman and CEO Edmund Kelly, and Allstate's president, chairman and CEO, Thomas Wilson.

429.    As Nationwide and State Farm have both been members of NAMIC since at least 1961, the list of executives of both companies who have served on the board of NAMIC and its various executive committees is extensive.

430.    Board meetings and other leadership obligations regularly bring high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

431.    The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry.  For instance, the associations worked together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act, as well as the annual P/C Insurance Joint Industry Forum.

B.      Insurance Institute of Highway Safety

432.    The Insurance Institute of Highway Safety (IIHS) describes itself as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

433.    This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

434.    Current members of the board of directors include senior executive from Defendants Farmers, USAA, GEICO, Progressive, Liberty Mutual, Hartford, Travelers, Nationwide and Country[16]

435.    Executives of the three trade associations, AIA, PCI and NAMIC, also sit on the IIHS board of directors.

436.    Not only does general membership and board membership provide the vast majority of the Defendants with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts, which directly financially benefits the Defendants.

437.    As discussed above, all of the Defendants regularly and routinely compel purchase

---

[16]The following Defendants do not, at present, appear to be member companies of IIHS: AIG, Allied Property and Casualty, American Access, American Heartland, Apollo, Auto-Owners, Delphi, First Acceptance, Safeway, Unique and Universal Casualty.  All other Defendants are member companies of IIHs, either directly or through their respective parent company.

and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible.   The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

C.     CAPA

438.    CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.  Specifically, aftermarket parts.

439.    When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA.  CAPA purportedly sets quality standards and conducts studies of aftermarket parts.

440.    What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm,  specifically for the purpose of reducing collision repair costs.

441.    Current Board of Directors for CAPA include State Farm, Allstate, Liberty Mutual and GEICO, Clark Plucinski, President of the Boyd Group, which operates the Gerber Collision repair shops (and DRP shops for Allstate, State Farm and GEICO), Tim Adelmann of ABRA, Inc., another MSO collision repair shop like Gerber (and also DRP shops for Defendants State Farm, Allstate , GEICO, USAA, Nationwide and Progressive.)

442.    As with membership in the IIHS, board membership for CAPA provides not only additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans by and between the largest property casualty insurers in the United States but CAPA is a

crucial cog in its well-established corporate policy of purchasing less expensive aftermarket parts whenever possible.

443.    The Defendants have gone to great lengths over many years to convince the public and various state agencies of the safety and interchangeability of aftermarket parts with OEM parts. Acceptance of this premise is directly financially beneficial to the Defendants as it provides immediate reward in the form of drastically reduced claims they must pay out.

444.    The impartiality of CAPA, as the creation of the insurance industry, financed by the insurance industry and openly working toward the insurance industry goal of reduced claims costs, is worthy of gaze with a weather eye.  This healthy skepticism is assisted by the substantial number of aftermarket parts CAPA de-certifies because they are of too poor quality to be in the stream of commerce.

445.    It is important to remember de-certification removes certification from aftermarket parts CAPA has already purportedly studied, tested and pronounced as quality collision repair parts.

446.    Last year, CAPA de-certified over a thousand aftermarket parts, many of them crash and safety parts, many of them for the most popular vehicles in the country, including hoods and fenders for Toyota Camrys, fenders, hoods and headlamp assembly for Honda Accords, headlamp assemblies for Subaru Outbacks, hoods for the BMW 3-Series, hoods, bumper covers, fenders and fog lights for BMW 5-Series, radiator supports for Dodge Chargers, Ford Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda Civic, among many others.

447.    Through this organization, the largest insurers representing the Defendants' mutual interests are in a position to not only make agreements affecting the body shop payment structure but

to ensure a generous supply of thousands of inexpensive, imitation aftermarket parts is available for the Defendants to compel purchase to further reduce the money they must pay out as claims.

## MOTIVE TO CONSPIRE

448.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

449.    Each of the Defendants has an obvious motive to agree, combine and conspire to fix prices, boycott and punish noncompliant shops and interfere with Plaintiffs' businesses at every possible level.  Profit.

450.    If the profits were minimal, the value of such a combination or agreement would be questionable.  However, the profits are not minimal.

451.    In 2013, State Farm reported a net income increase of 63%, resulting in a record high net worth of $75.9 billion.  Its underwriting gain was announced at $230 million.

452.    Allstate reported a 2013 net income of $2.3 billion dollars.

453.    GEICO reported 2013 profits of $1.1 billion..

454.    Progressive reported 2013 net income of $1.16 billion.

455.    USAA reported 2013 net income of $2.7 billion dollars.

456.    Without even considering the remainder of the Defendants, these amounts can be placed into perspective:  The top five market share holders in the State of Alabama had higher net

incomes in 2013 than the gross national domestic product of eight African countries combined.  It is represents more money than was spent on the entire defense budget by Oman, Jordan, Afghanistan, Venezuela or Pakistan in 2013, none of which are generally known as peaceful havens.

457.    Additionally, the Defendants have a direct opportunity to substantially affect and increase their respective bottom lines.

458.    In insurance industry parlance, the "float" is the monies collected by insurers as premiums that are not–or not yet– obligated for payment of claims or operating expenses.  Rather than just sitting on the float, an insurer is free to invest it and pocket the profit from those investments.  Documentation publicly available shows the majority of the named Defendants invest through BlackRock, Inc.

459.    Defendants State Farm, Allstate, Nationwide, USAA, SAFECO, and GEICO  are all invested in or through BlackRock.[17]

## BlackRock

460.    BlackRock, Inc. ("BlackRock"), is the largest asset management firm in the world. BlackRock also engages in private equity investing, purchasing ownership interest in companies. BlackRock boasts on its website that it manages $4.32 trillion in assets, manages 7,700 portfolios and has twenty of the top twenty-five insurers as its investors.

## BlackRock and Paint and Materials

461.    BlackRock, via one of its numerous investment vehicles, BlackRock Institutional

---

[17]Swiss Re is one of BlackRock's larger institutional investors.  GEICO's ultimate parent company, Berkshire Hathaway, owns 3.01% of voting rights in Swiss Re.  BlackRock owns approximately 10.04% of voting rights.

Trust Company, N.A., (referred to collectively as "BlackRock") owns a significant amount of shares in PPG Industries ("PPG"), which manufactures and sells automobile paint used in the collision repair industry.  As of September, 2014, BlackRock was the third highest shareholder of PPG, owning 5.7 million shares.[18]

462.    Upon information and belief, PPG offers substantial discounts to MSOs and non-MSO shops which are members of DRPs, sometimes up to seventy percent (70%).

463.    Upon information and belief, PPG withholds these substantial discounts from non-DRP shops.

464.    These discounts encourage purchases by the MSOs and DRP shops.  At the same time, Defendant insurers refuse or reduce payment to Plaintiff shops for paint, stating the charges are excessive because other shops, i.e., MSOs and compliant DRP shops, are able to perform paint tasks for less money and therefore the charges are not "market."

465.    Defendants and their subsidiaries holding investments in or through BlackRock obtain a two-fold profit by steering customers to MSOs and DRPs.  On the front end, Defendants are able to suppress and reduce claim payments related to paint and paint materials on the ground that costs above their caps are out of line with "the market," thereby retaining funds they would ordinarily have to pay out as claims.

466.    On the back end, Defendants who invest with or through BlackRock profit through increased sales of the products manufactured and sold by the company in which they have invested,

---

[18]BlackRock's share ownership in PPG has varied but overall has steadily increased over the last several years, nearly doubling since June, 2011, when it owned 3 million shares.

PPG.   Therefore claims payments made to MSOs for paint and paint materials are, in essence, financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit.

467.    The Defendants reaping these "coming and going" profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, Safeco (Liberty Mutual subsidiary) and Progressive.  BlackRock owns over 14,000,000 shares of Progressive Corporation, Defendant Progressive's parent corporation.

468.    Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from steering to shops using PPG paint via their investment portfolio holdings.

<u>BlackRock and Parts</u>

469.    BlackRock also owns a substantive portion of LKQ Corporation ("LKQ") stock (8.55 million shares).  LKQ Corporation is a leading supplier/seller of "recycled" (i.e., salvaged from junk yards) auto parts.  LKQ's subsidiary, Keystone Automotive Industries, Inc., ("Keystone") is the largest supplier of aftermarket (i.e., counterfeit) parts in the United States.

470.    Salvaged and aftermarket parts seldom fit properly, as discussed in detail above. However, every named Defendant in this cause writes repair estimates specifying the purchase of repair parts from LKQ and/or Keystone.[19]

471.    This is required even when a particular insurer's on-the-ground adjuster or estimator

---

[19]Depending upon the type of repair being performed, parts from either or both LKQ and Keystone may be required.

is fully aware a part is not locally available through either LKQ or Keystone.  The adjuster or estimator will still write the estimate for use of those parts.

472.    When a Plaintiff shop either refuses LKQ or Keystone parts, or none is available in a timely manner and must therefore be purchased from another source, the Defendants refuse to compensate Plaintiffs for anything more than the part could have been purchased (either in reality or theoretically) from those sources.

473.    Defendants and their subsidiaries holding investments in or through BlackRock obtain a three-fold profit from these actions.  First, Defendants are able to suppress and reduce claim payments related to parts purchases, thereby immediately retaining funds that would otherwise be paid out on claims repairs.

474.    Second, Defendants generally refuse to pay labor and other costs associated with modifying salvaged and/or aftermarket parts to fit a vehicle, although use of such parts is entirely at the direction and insistence of the Defendants.  Defendants thereby retain funds which should be paid out on claims repairs.

475.    Third, Defendants who invest with or through BlackRock profit through increased sales of the products sold by the companies in which they have invested, LKQ and its subsidiary, Keystone.  Therefore claims payments made for parts purchases from LKQ and Keystone are returned to the insurance investors as investment profit. The Defendants reaping these tripartite profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, Safeco and Progressive.

476.    Based upon information and belief, discovery is likely to reveal the remaining

defendants similarly hold investment through BlackRock and therefore directly profit from parts

purchase specification to investment portfolio holdings, including LKQ and Keystone.

<u>Necessity of combination or conspiracy</u>

477.  Although several of the largest Defendants are known investors of or through

BlackRock, in the absence of group agreement, the profit motive would not be worth the effort in

the absence of a combination or conspiracy amongst the Defendants.

478.  A single insurer engaging in the actions described in this Complaint would generate

such a small effect upon the large investments of the Defendant insurers that it would not noticeably

alter investment returns.  The more insurers who participate in steering, compulsory parts purchases

and paint cost manipulation, the greater the substantial profit for all.

**IN THE ABSENCE OF AN AGREEMENT AMONG THE DEFENDANTS, THEIR ACTIONS WOULD INDIVIDUALLY BE CONTRARY TO BEST INTERESTS**

479.  Allegations referencing "Defendant insurers" or "the Defendants" are intended to

convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity

or conduct described below.  "Defendant insurers" or "the Defendants" should be read in such a way

that each defendant is having the allegations made about it individually.

480.  If taken individually, the Defendants' actions would be contrary to their own best

interests.  Such actions would substantially harm a lone Defendant.

481.  An auto insurer's mandate is to insure risk and, when that risk is realized, to pay the

loss incurred.  An auto insurer which regularly fails or refuses to pay for full and complete repairs

to vehicles, insists on using salvaged or imitation parts, or in any fashion left a vehicle unsafe or

noticeably less safe to operate would very likely soon find itself losing its customers to other

insurers.

482.     This is particularly so in a world of instant communication, people like to share and they are able to share with the entire world in the push of a Twitter button or Facebook post.  Stories of complete failure to repair and just as complete lack of concern by the insurer as related above, would substantially damage both the reputation and the viability of the business as a going concern.

482.     The overwhelming power exerted by the group of Defendants allows the evidenced scheme to succeed.  While one or two Defendants leaving the group could find stability or even marginal additional success as the companies who care and pay for proper repairs, the remainder would far outstrip the minority in sheer profits.

## EFFECTS ON COMPETITION IN THE BODY SHOP INDUSTRY

484.     Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below.  "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

485.     Defendants actions have effectively removed all competition from the collision repair industry and constitute an unreasonable restraint of trade.

486.     While it may certainly be said the Defendants actions have achieved great effect for the insurance industry, particularly in the area of financial profit, it cannot be said Defendants actions have in any fashion stimulated competition in the collision repair industry.  Whether competition between insurers is robust is irrelevant, whether the insurance industry has benefitted from its illegal actions is irrelevant.  Considering that would be very much the same as suggesting a thief who has

profited by his deeds justifies the loss to the victim and is therefore excused.

487.     The Plaintiff body shops are not in competition with the Defendants.  As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops is the only effect to be measured.

488.     In the present case, there is no competition whatsoever.  Competition presumes a free and open market, where innovation is encouraged.  That is not the present state of the body shop industry.  There have been no economies or efficiencies created within the body shop industry, nor have prices decreased as a result of a dynamic market, nor incentives created.

489.     The Defendants fix price ceilings for the Plaintiffs, as well as all other body shops. The Defendants generally leave a particular fixed price structure in place for several years in a row.

490.     Attempts at expansion are not rewarded, investments in capital equipment is risky, though necessary as federal guidelines regarding gas mileage minimums continue to rapidly evolve the physical structure of vehicles, requiring new equipment, new training and substantial investment.

491.     Consumers have not benefitted by the absence of collision industry repair competition.  To the contrary.  As shown above, the repair shops to which the Defendants encourage patronage quite often do extremely poor work, very dangerous work and a consumer is left in a worse position than whence begun.  Quality is not encouraged nor even necessary as the fixed prices/ punishment system created and perpetuated by the Defendants as a concerted group rewards the worst body shop at the same level as the very best.

492.     Certainly some body shops are successful.  However, negative effects on competition are not weighed and measured by the effect on competitors, but on competition.

493.    In this case, the Defendants violations of state and federal law have effectively eradicated competition in the body shop industry.  The Defendants actions have had a wholly detrimental effect on the body shop industry and are detrimental to the public.

## INTENTIONAL NATURE OF DEFENDANTS' WRONGFUL CONDUCT

494.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraphs 10 through 84 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

495.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "8."

496.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances;  (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

497.    These are the exact same practices the Defendant insurers have engaged in and which are the subject of this Amended Complaint.

498.    The Consent Decree provided the following relief: (1) enjoined the defendants from

placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

499.    The clear terms of the Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

500.    Except as noted otherwise, the named Defendants are members of the contemporary associations which are still bound by the Consent Decree's terms.

501.    1963 Defendant Association of Casualty and Surety Companies merged with the American Insurance Association ("AIA") in 1964 to form the "present-day AIA."

502.    As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AIA and its members, and all other persons in active concert or participation with the AIA, whether or not an actual member of the AIA.

503.    The Defendants which are known to be members of AIA are set forth above. Plaintiffs

anticipate discovery will disclose additional members of this association.

504.    1963 Defendant American Mutual Insurance Alliance became the Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies.  The Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form the present-day Property Casualty Insurers Association of America ("PCI").

505.    As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the AIA.

506.    The Defendants which are known to be members of AIA are set forth above. Plaintiffs anticipate discovery will disclose additional members of this association.

507.    1963 Defendant National Association of Mutual Insurance Companies ("NAMIC") remains intact and active to the present day.  The terms and requirements of the 1963 Consent Decree are binding upon and enforceable against NAMIC and its members, and all other persons in active concert or participation with the NAMIC, whether or not an actual member of NAMIC.

508.    The Defendants which are known to be members of AIA are set forth above. Plaintiffs anticipate discovery will disclose additional members of this association.

509.    The Defendants which are not known at this time to be individual members of the associations, however, are acting in active concert and participation with the remaining Defendants, have knowledge of the 1963 Consent Decree and they are therefore bound by the terms and

conditions of the Consent Decree, whether or not they are a member of any of the associations.

510.    Defendants actions willfully violate the terms of the 1963 Consent Decree by effecting plans, programs or practices which have the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

511.    As such, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

512.    Defendants are therefore liable to Plaintiffs for punitive damages.

## CAUSES OF ACTION
## COUNT ONE: VIOLATIONS OF THE SHERMAN ACT - PRICE FIXING

513.    The United States economy rests upon open market systems in which vigorous competition benefits individuals and businesses alike.  The federal government has long recognized the necessity of public policies and a regulatory framework designed to foster and protect the free market system from activities that restrict interstate commerce and/or marketplace competition.

514.    The Sherman Act, passed in 1890 as U.S.C. §§ 1-7 and amended by the Clayton Act

in 1914 (15 U.S.C. §§ 12-27)  functions "not to protect businesses from the working of the market; [but] to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

515.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

516.    Through concerted actions, and\or explicit agreement, the Defendants have formed and engaged in a conspiracy or combination to fix and impose maximum price limits upon the Plaintiffs for their products and services.

517.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

518.    The Defendants and co–conspirators have engaged in combination and/or conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

519.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops as shown by the "market rate" adopted by the Defendants as a group, though none are purported to have access to the survey conducted by only one of them; uniformity of prices fixed

across mixed population centers though the "market rates" are purported to relate to an undefined but specific geographic area; specific statements by the named Defendants adhering to a single fixed price formulated by one member of the combination or conspiracy and adopted by all, uniformity of action in instances where Defendants should not have access to particular information; to wit, State Farm does not publish or make public its survey results, without mathematical value though it is, and the remaining Defendants do not conduct their own purported survey and yet reach the same "market rate" as State Farm.

520.    The Defendants have all refused to raise their "market rates" in Alabama, specifically because State Farm has not raised the "market rate." Various Defendants' representatives have made explicit statement that only State Farm sets the market rates.  Further various Defendants' representatives have stated they will only raise their rates when State Farm does, conduct which is indicative of the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.

521.    State Farm regularly and routinely seeks to keep what it considers proprietary information, including internal training and assessment manuals, sealed from public view.

522.    The Defendants all utilize and admit the applicability of the body shop industry databases but regularly and routinely ignore the databases in the exact same fashion, i.e, calling the same procedures included operations when the databases say the opposite, denying the applicability of processes and procedures the databases states are necessary repairs, admitting the baseline application of the industry database but failing to conform to that minimum standard, numerous defendants telling different Plaintiffs each is the only one to perform or demand payment for the

same set of processes

523.     The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, harming consumer choice and public interests, subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

524.     Neither the Plaintiffs, nor other members of the auto collision repair industry are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

525.     The United States Supreme Court has held that direct evidence of an agreement is not necessary to establish a violation of the Sherman Antitrust Act.  The U.S. Supreme Court has noted several examples of behavior, including parallel conduct, which state a claim under § 1 of the Sherman Act.  These examples include parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties; and conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement; . *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, FN4  (2007).

526.     Defendants actions constitute behavior which is likely not the result of chance, coincidence, independent response to common stimuli or mere interdependence unaided by an advance understanding.  Evidence of this include, but is not limited to:

•        Explicit admissions by certain Defendants that the insurance companies meets to

arbitrarily fix the labor rates of the body shop industry, including the Plaintiffs' labor rates;

• Explicit admissions by certain Defendants asserting State Farm determines the "market rate" and they are not individually free to change what they pay as "market rate" without State Farm's approval;

• Agreement and combination of all Defendants in the price fixing by adoption of State Farm's rates and refusal to alter without State Farm's approval;

• All of the Defendants fix prices at amounts which are unrelated to the actual prices charged by Plaintiffs;

• The prices fixed by Defendants are all below the prices charged by Plaintiffs;

• None of the Defendants save State Farm purport to undertake any survey or other analysis of the prices charged by body shops to determine a going rate in the body shop industry within the State of Alabama;

• All of the Defendants fix prices at what they claim is the market rate, which is identical to that of State Farm;

• State Farm does not publish or otherwise make publicly available its survey results yet each of the other named Defendants enforce the same purported "market rate;"

• State Farm's method of determining the market rate is contrived and fabricated and not based on any recognized method of mathematical or statistical analysis;

• A State Farm employee has admitted State Farm controls and manipulates the

market, setting the "prevailing competitive price" at whatever amount State Farm chooses and State Farm intentionally sets out to control and suppress, i.e., fix, the body shop labor market;

- All Defendants assert the market rate is the same across the entire state  though posted rates show variability as would be expected;

- The likelihood of all Defendants independently reaching the same conclusion as State Farm as to the market rate is statistically impossible, as State Farm creates the market rate from whole cloth, does not account for variability across distances or in differing population centers;

- All Defendants use the p-page databases, and all exclude payment for the same processes and procedures for the same stated reasons, even when those reasons are contradicted by the databases and the ordinary practices and procedures of the body shop industry.

- None of the Defendants individually hold a majority of the market share within the State of Alabama; collectively, the named Defendants control over eighty five percent (85%) of the insurance market within the State of Alabama and are able to compel fixed prices upon the Plaintiffs which none would be able to accomplish alone or in the absence of combination or conspiracy.

- The Defendants engage in conduct designed to  keep their conduct secret including, but not limited to threatening antitrust violations to keep the body shops from discussing the price fixing in which the Defendants are engaged.

527.    It is implausible that all of these events occur regularly and over the course of years as the result of chance or coincidence.  The only plausible inference from these facts is that the Defendant insurers have agreed and conspired to establish fixed rates within the entirely separate industry of collision repair shops.  That these actions are clearly motivated by profit and self-interest does not make them any less actions taken in conformity with and plausibly suggestive of a conspiracy or combination in restraint of trade.

528.    In fact, it may be logically asserted that all conspiracies or combinations in restraint of trade are motivated by profit and self-interest.  The mere fact that Defendants' conspiracy or combination in restraint of trade may be motivated by profit and self-interest does not make it any less a violation of federal law.

529.    Horizontal price fixing is per se illegal.  *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2239 (U.S. 2013), *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (U.S. 2007), *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (U.S. 2006).  No showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. Where there is a per se illegal price-fixing agreement, it is no defense that the agreement at issue did not have anticompetitive effects, or that defendant's motives were benevolent. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218 (U.S. 1940).

530.    Additionally, the Supreme Court long ago recognized antitrust violations for price fixing under nearly identical circumstances as those present here.  Where a group of defendants has substantial or complete control over the avenues for selling plaintiffs' products or services,  and

Defendants fix prices and exert economic coercion upon plaintiffs whose only options are to submit to fixed prices or go out of business, the Defendants have violated the law.  *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 29 (1947).

531.     The Defendants' actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

<u>**COUNT II**</u>
<u>**VIOLATION OF THE SHERMAN ACT - BOYCOTT**</u>

532.     The Sherman Act makes every contract, combination, or conspiracy in unreasonable restraint of interstate commerce illegal.  26 Stat. 209, as amended, 15 U.S.C. §1.

533.     While most Sherman Act claims are analyzed under the rule of reason standard, some actions pose such a habitual unacceptable risk of restraining trade they are unreasonable *per se*. *Vacation Break U.S.A., Inc. v. Mktg. Response Grp.*, 169 F.Supp. 2d 1325 (M.D. Fl. Tampa Div. (Mar. 26, 2001).

534.     The United States Supreme Court has repeatedly held that group boycotts are *per se* violations of the Sherman Act.  See, *e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966); *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959); *Fashion Originators' Guild Assoc. v. FTC*, 312 U.S. 457, 61 S. Ct. 703, 85 L. Ed. 949 (1941)(boycott designed to coercively influence trade practices, rather than to fully eliminate boycott victims from the market held still *per se* illegal).

535.    Those decisions that have rejected the *per se* rule generally applied to boycott activity in favor of a rule of reason analysis have been limited to circumstances where the conduct complained of may reasonably be shown to fall outside the rationale of the *per se* rule; that is, where the conduct arguably furthered a public policy goal such as improving market efficiency or increasing healthy competition. See, *e.g.*, *U.S.A. v. Realty Multi-List, Inc.*, 629 F. 2d 1351 (5th cir. 1980).

536.    Defendants' common scheme herein acts to restrain trade and diminish competition and market functionality for Plaintiffs and consumers. Whether viewed under a *per se* rule or a rule of reason analysis, Plaintiffs allege herein a restraint of trade in violation of the Sherman Act.

537.    "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott. *Id.* at 543 (citing L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

538.    Each of the Defendants have actively participated in, and gained economic advantage from, a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme. This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the

market.

539.    The common scheme involves multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.   Each of these forms of conduct individually constitute an unreasonable restraint of trade and a *per se* violation of the Sherman Act §1.

540.    The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott.   *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

541.    Defendants have enlisted, and continue to enlist third party consumers in need of auto repairs as unwitting participants in their common scheme to coerce Plaintiffs and punish Plaintiffs.

542.    Evidence of concerted boycotting by Defendants against Plaintiffs includes, but is not limited to, the Defendants making the same false statements, fraudulent misrepresentations and misleading innuendos about Plaintiffs to consumers who have identified Plaintiffs as their intended repair facility; refraining from disclosing quality of repair issues at preferred, compliant shops, timing of boycotting to engage with intentional punishment decided upon by one or two insurers and enlisting the other Defendants into boycotting a particular Plaintiff at the same time.

543.   Defendants' ongoing conduct in furtherance of the common scheme to boycott, and thereby coerce and/or punish Plaintiffs has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

544.   Agreement to boycott is shown by the Defendants knowledge of changed circumstances, i.e., when a Plaintiff has left another Defendants' direct repair program followed by defamatory and misleading statements to drive customers away from the defecting Plaintiff.  As this information is not publicly shared, the unaffected Defendants should not have knowledge of the actions of one shop with which it is not itself even informally associated. But unaffected Defendants do have knowledge and do act upon that knowledge as a concerted group with malicious intent to harm particular plaintiffs.

545.   Agreement of purpose is also shown by the common nature of the falsehoods and misrepresentations utilized by the various Defendants in their boycotting and steering of customers from Plaintiffs' places of business.  The nearly identical nature of the wording leads to a reasonable conclusion that an agreement was reached as to the most effective statements to use to the greatest effect.

546.   The Defendants actions are violations of federal law and have directly caused the Plaintiffs to incur substantial damages.   Defendants are continuing and will continue the aforementioned offenses unless the relief requested herein is granted.

## PRAYER FOR RELIEF

As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will

continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the

following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

    (1)    Placing into effect any plan, program or practice which has the purpose or effect of:

        (a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

        (b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

    (2)    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

    (3)    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff

("steering").

    (4)    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.    Pre- and post-judgment interest.

H.    Any additional relief the Court deems just and appropriate.

## CONCLUSION

While this matter has many aspects and trade terms, the essence of our claim is simply this:

In the American marketplace there are two types of body shops. There are shops who strive to serve the customer, the owner of the car, and there are those shops who believe the insurance company is their customer. The defendants have successfully created a "market" system that rewards the body shops that will cut corners so they can increase profits and punishes body shops who are unwilling to compromise the quality or safety of the American consumers' repair.

The whole intent of antitrust actions was and is to increase competition for the benefit of the American consumer. Defendants' actions have violated the letter and the spirit of the law. Instead of providing the best quality repairs for the lowest cost they have fixed the costs to their utmost benefit and forced the market into a race to the bottom in terms of quality to the customer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against all

Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the 18th day of September, 2015.

**KALLEMEYN COLLISION, et al**

BY:   /s/ *Allison P. Fry*
JOHN ARTHUR EAVES, JR.
ALLISON P. FRY

John Arthur Eaves
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone:    601.355.7961
Facsimile:    601.355.0530
JohnJr@eaveslaw.com
Allison@eaveslaw.com

Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiffs' Amended Complaint* was filed electronically on the 18TH day of September, 2015, and will be served upon all ECF-

registered counsel by operation of the Court's electronic filing system.  Parties and counsel may access this filing through the Court's system.

<u>*s/ Allison P. Fry*</u>

Allison P. Fry

JOHN ARTHUR EAVES,

ATTORNEYS AT LAW

101 N. State Street Jackson, MS 39201

601.355.7961 Tel

601.355.0530