**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | | |
|---|---|---|
| KALLEMEYN COLLISION CENTER INC., | * | |
| *et al.*, | * | |
| PLAINTIFFS, | * | MDL Docket No. 2557 |
| | * | |
| v. | * | Case No. 6:14-cv-06011-GAP-TBS |
| | * | |
| 21st CENTURY CENTENNIAL | * | Originally filed in Illinois |
| INSURANCE COMPANY, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**CERTAIN DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

The Defendants listed in **Exhibit A** ("Defendants") move pursuant to Fed. R. Civ. P.

12(b)(6) to dismiss Plaintiffs' First Amended Complaint ("FAC") with prejudice.[1]

**MEMORANDUM OF LAW**

**I.    INTRODUCTION**

The antitrust claims in Plaintiffs' FAC are substantively identical to the ones in the

Florida Second Amended Complaint that the Court recently dismissed in its entirety with

prejudice (*A&E Auto Body*, *Inc.* ("*A&E*"), Doc. 341), and should be dismissed for the same

reasons.  The FAC adds mostly irrelevant verbosity to allegations that this Court already

ruled are insufficient to allege an antitrust conspiracy, and adds no factual allegations

sufficient to state plausible claims for a price-fixing conspiracy or boycott. As in their

previous complaint, Plaintiffs do not allege the existence of any express agreement among

Defendants.  Instead, the FAC (i) continues to rely on allegations of unilateral conduct and

---

[1] The FAC was filed September 19, 2015, after expiration of the Court's September 18 deadline. (*See* Doc. 128; *In re: Auto Body Shop Antitrust Litigation*, Doc. 228.)  Certain Defendants will be contemporaneously filing a Motion to Strike this untimely pleading.

conscious parallelism that cannot give rise to claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal deficiencies identified by this Court in its Order of Dismissal in this case (Doc. 119, *adopted* Doc. 128) and in its Orders of Dismissal in the companion *A&E* case (*see A&E*, Docs. 293 & 341); and (iii) continues Plaintiffs' pattern of impermissible group pleading.[2]  The key features of the FAC's "new" allegations (but which in substance are nearly identical to the ones in *A&E* that the Court recently dismissed with prejudice) are summarized below:

- Plaintiffs allege no express agreement among Defendants to set body shop reimbursement rates.

- The FAC relies on allegations that various Defendants, at unspecified times, chose to follow some State Farm labor and material rate <u>increases</u>. (FAC ¶ 247.)  Those allegations, if true, show nothing more than State Farm's unilateral conduct, followed by some parallel reimbursement conduct by some Defendants at some time.  That does not constitute parallel action on behalf of all Defendants.

- Although the FAC purports to allege certain "plus factors," such as opportunities to conspire and profit seeking, (FAC ¶¶ 421-27, 448-78), these allegations are substantively indistinguishable from the same conclusory allegations previously rejected by the Court.  Plaintiffs' fanciful theory that some Defendants have relationships with the investment and asset management firm BlackRock lacks any factual or logical connection to a conspiracy claim.

- To support their group boycott claim, Plaintiffs have added a handful of allegations of purported incidents of "steering" over the past 10 years by a few of the 74 Defendants.  (FAC ¶¶ 362-74.)  Plaintiffs assert that these isolated instances of steering by a handful of Defendants acting independently, somehow support their

---

[2] Plaintiffs' FAC is unacceptably unclear on several key issues.  For example, the FAC repeatedly refers to "Alabama" when Plaintiffs presumably meant to say "Illinois," indicating that many of Plaintiffs' allegations may not actually refer to conduct of the Illinois defendants.  (*See, e.g.*, FAC ¶ 266 (alleging that "Cincinnati is not a Defendant in this, the Alabama action…"); *see also id.* ¶¶ 261, 264-65, 342, 390, 456, 520, 526.)  In addition, it is unclear whether Collision Craft Auto Body & Frame, Inc. ("Collision Craft") is still asserting claims or has dropped out of the lawsuit.  The FAC does not include a full caption and does not allege jurisdictional facts regarding Collision Craft (*see id.* ¶¶ 4-9), but the only paragraph in the entire FAC mentioning Collision Craft refers to it as a "Plaintiff."  (*Id.* ¶ 199) (alleging that Collision Craft "is not associated with any DRPs").

sweeping claim that all Defendants have agreed to engage in an unlawful boycott against all Plaintiffs. That inference is neither logical nor plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). There are no factual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff shops. The FAC fails even to allege conduct that could fairly be described as parallel. Moreover, the FAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering by individual insurers are not equivalent to a *concerted* refusal to deal. Indeed, the allegations make clear that these Plaintiffs continue to do business with the various Defendants, so there has clearly been no "boycott."

- Plaintiffs have larded the FAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts. (FAC ¶¶ 138-160, 330-53.) Plaintiffs do not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct. Allegations that individual insurers acted in their own self-interest to reduce the cost of automobile repairs is not evidence of any anti-competitive conspiracy. It is precisely the kind of profit-maximizing conduct that one would expect in a competitive marketplace. *A&E*, Doc. 341 at 9.

- Finally, throughout their FAC Plaintiffs continue to employ the same collective pleading technique that the Court has previously and repeatedly rejected as improper. *See A&E*, Doc. 110 ¶ 4; *A&E*, Doc. 293 at 6 & n.8. Plaintiffs fail to adequately allege facts tying even a single defendant to the alleged overarching conspiracy, and the FAC is devoid of specific allegations against the vast majority of the 74 named defendants.

After nearly a year of trying, Plaintiffs continue to fall far short of "nudg[ing]" their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. It is clear now that, no matter how many tries they get and no matter how many pages they draft, Plaintiffs cannot state a claim against Defendants. Plaintiffs' Sherman Act claims therefore should be dismissed with prejudice.

## II.  PLAINTIFFS' ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED.[3]

### A.  Plaintiffs' New Conspiracy Allegations Fail To Overcome the Shortcomings of Their Original Complaint.

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was damaged by the violation." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted).  Plaintiffs still fail to satisfy this requirement because they still have not alleged a plausible conspiracy among all or any Defendants.

The FAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556).  Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

---

[3] Defendants adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's June 3, 2015 Report and Recommendation (Doc. 119 at 4-5, *adopted* Doc. 128).

4

1.     **To the Extent Conscious Parallelism is Alleged, The FAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy To Fix Reimbursement Rates.**

Plaintiffs allege that Defendants imposed maximum labor rates for automobile repair services.   The "'crucial question,'" however, is "whether the challenged anticompetitive conduct 'stem[s] from an independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (citation omitted); *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

Like its predecessor, the nearly-identical Florida Second Amended Complaint, and the dozens of substantially similar complaints Plaintiffs' counsel has filed in this MDL, the FAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy.   The rate-fixing conspiracy alleged in the prior complaint was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate-reimbursement levels set by any Defendants.   The FAC adds some allegations of episodic instances in which some, but not all, Defendants paid similar prices for repairs.  This Court has already explained, however, that such parallel conduct "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense."  *A&E*, Doc. 293 at 16. In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended

Complaint about the alleged agreement, such as how the Defendants entered into it, or when." *A&E*, Doc. 293 at 17; *see also A&E*, Doc. 341 at 6-8.

Plaintiffs have not cured these defects here.  The FAC still contains no allegation that Defendants entered into any agreement to fix prices or to boycott suppliers, and no contextual allegations to suggest the existence of such an agreement.  Plaintiffs still do not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants.  There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended.  Indeed, for some Defendants there are virtually no substantive allegations at all.  Their allegation that the supposed parallel conduct has been going on for at least 10 to 15 years (FAC ¶¶ 172, 360) merely underscores the implausibility of their conspiracy theory.  None of the newly added allegations in the FAC, separately or in context, raises a suggestion of a preceding agreement among Defendants to fix reimbursement rates.  There is no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate-reimbursement levels.  Indeed, Plaintiffs' core allegation remains the self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiffs do not allege any facts to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 679 (2009), Plaintiffs have not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

Plaintiffs' allegations of supposed parallel business conduct are also conclusory and insufficient group pleading.  For instance, they claim that State Farm determined that the market rate throughout Illinois was $46 per hour from late 2008 to early 2012, but then merely allege all Defendants paid the same market rate without specifying when, how or for what reason any Defendant allegedly revised its rate.  (FAC ¶¶ 243-45.)  Moreover, Plaintiffs allege that Defendants <u>raised</u> their reimbursement rates after State Farm changed its rates. (*Id.* ¶ 247.)

Plaintiffs surmise from these alleged instances of parallelism that the rates paid by State Farm "could only have been provided by State Farm to its ostensible competitors." (FAC ¶ 273.)  Plaintiffs do not explain why, in service of a purported scheme to suppress reimbursement rates, Defendants would gradually raise their rates in response to State Farm's announcement of its own independent rate increase.  (*Id.* ¶ 247.)  They also do not allege when, how, by what means or to whom State Farm provided such information to the other Defendants or that other Defendants agreed to use the same rates.  Nor do they allege that any Defendants possessed this information before State Farm raised the rates it paid to shops.

State Farm is alleged to be the market leader (FAC ¶¶ 120-21) and to unilaterally set the prices it will pay for repairs based on its regularly conducted survey (*see id.* ¶¶ 220-34). Merely following a price leader is common within different industries and does not suggest the existence of an agreement.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price

increase is likely to be followed'" and concluding that "each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision" (citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs focus many allegations on State Farm's surveys, but they do not allege that those surveys involved anything other than State Farm's unilateral conduct or that any Defendant implemented a price change before State Farm changed the rates it paid body shops in response to its survey results.  (FAC ¶¶ 217-18.)  In any event, the other Defendants did not need to know State Farm's survey methodology or to conduct their own surveys to know what State Farm and other insurers actually paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested insurers would know the rates paid by their competitors.  Plaintiffs allege that Defendants engage with Plaintiffs and with other body shops in hundreds of transactions every day in the ordinary course of business.  The rates body shops are paid are an integral part of these transactions.  Body shops doing business with State Farm across Illinois, including Plaintiffs, all would learn in the ordinary course of business what rates State Farm was willing to pay them, just as they would know the rates paid by other insurers with whom they do business. Moreover, these rates allegedly are static for years at a time.  (FAC ¶ 489.)  Thus, it is both

obvious and entirely reasonable that the rates State Farm paid were well known among both body shops and the insurers with whom they regularly transact. *See A&E*, Doc. 341, at 10 ("Given that this information would be possessed by every automobile repair shop in the state, it seems unlikely the Defendants could keep it secret even if they wished to do so."); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner."). That alleged knowledge is essentially public and does not suggest a conspiracy.

Plaintiffs' rhetorical contention that the data "could only have been provided by State Farm to its ostensible competitors" is a mere conclusion, with a demonstrably faulty premise. (FAC ¶ 273.)  Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay.  (*See, e.g.*, *id.* ¶¶ 243-44, 247, 269-70.)  Plaintiffs' allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing concessions or "most favored nations" provisions that oblige shops to charge no more than what other insurers pay for the same services.  (*Id.* ¶¶ 173-75, 178.)

Moreover, in a case purporting to be about a conspiracy to suppress rates, the FAC's sole factual allegation of parallel price movements involves Defendants <u>increasing</u> rates, not decreasing them, to the <u>benefit</u> of body shops.  (FAC ¶¶ 247.)  The body shops themselves obviously knew what rates State Farm was paying them and almost certainly would have been eager to tell other insurers refusing to pay more than the market leader that the market

leader had increased the rates it was willing to pay.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 329 ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner.").  The decisions of those insurers to increase their own rates after State Farm had increased its own market rate hardly indicate the presence of an agreement to suppress the rates (and in any event certainly did not prejudice Plaintiffs).  *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented).  If anything, this example tends to show that pricing movements in the market are the result of independent rather than concerted action.

In addition, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'"  *Quality Auto,* 660 F.2d at 1205 (citation omitted); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competitors."); *cf. In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented).

In short, Plaintiffs' factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of Defendants to demand

lower prices and to refuse to pay more than their competitors were being charged.  *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice).  In dismissing the complaint in the *A&E Auto Body* case, this Court analyzed factually indistinguishable allegations and ruled that Plaintiffs' allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . .  Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18; *see also A&E*, Doc. 341 at 8 ("This argument fails for the obvious reason that paying as little as possible for repairs is clearly in the self-interest of automobile insurers, as it improves their bottom lines.").  Plaintiffs have not provided any new allegations in the FAC that would alter this conclusion in the present case.[4]

---

[4] Plaintiffs now allege that an unidentified "agent" of State Farm stated that "'every iota'" of the Louisiana Attorney General's action against State Farm "'is the truth . . . . when you read [the complaint], it's like, that "that's us."'" (FAC ¶ 257.)  This purported recitation of an unidentified agent's personal opinion is too vague to provide any indication of which allegations this unspecified agent supposedly thinks are accurate or why the agent should be supposed to have any knowledge of the truth or falsity of any particular allegations.  Moreover, the action brought by the Attorney General of Louisiana is replete with even vaguer and more conclusory allegations than those in the FAC and focuses on unilateral conduct by State Farm.  The Attorney General's Petition asserts only unfair trade practices and an intra-corporate conspiracy among State Farm entities (which is not a cognizable conspiracy under federal antitrust law, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)), not a conspiracy between State Farm and any outside insurance companies.  This supposed admission thus gets Plaintiffs no closer to satisfying their pleading obligations than they were before.

**2.      The FAC Does Not Even Adequately Allege Parallel Conduct.**

While the FAC cannot survive a motion to dismiss as to any Defendant, a separate basis for dismissal is that the FAC offers no facts as to 62 out of 74 Defendants' alleged participation in a price fixing and boycott scheme.  *See A&E*, Doc. 341 at 17, n.8 ("not[ing] that the failure to include any allegations of tortious interference regarding 34 of the 39 Defendants is a separate basis for dismissal with prejudice of Count III as to those 34."). Under the heading "Collusion by Defendants with State Farm," the FAC makes a handful of allegations about USAA, Allstate, GEICO, and non-defendants Louisiana Farm Bureau and Cincinnati Insurance (many of which, notably, describe alleged conduct outside Illinois), (FAC ¶¶ 254-66), but fails to allege any facts as to the other 62 of the 74 Defendants in this action.  As to these Defendants, the FAC merely alleges: (1) that the Defendant is a member of certain trade organizations; and (2) that the Defendant uses DRPs (although Plaintiffs acknowledge that "DRPs are not in and of themselves a problem" (*id*. ¶ 172)).  Given that 62 of the 74 named Defendants are not included in any substantive allegations, the FAC fails to allege even parallel conduct, much less any agreement or concerted action.  *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel. The cattlemen have not done this.") (citations omitted); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978) (plaintiff "brought forth no evidence of parallel behavior suggesting an unlawful agreement.").

3.      **To the Extent Plaintiffs Attempt to Allege "Plus Factors," the FAC Allegations Do Not Support a Plausible Inference of Conspiracy.**

The FAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies." *See Twombly*, 550 U.S. at 565 n.10. Indeed, Plaintiffs admit they have no direct evidence that any defendant agreed to participate in the alleged conspiracy.  (See FAC ¶ 525 (arguing that "direct evidence of an agreement is not necessary to establish a violation of the Sherman Antitrust Act")).   In the absence of direct evidence of an agreement to conspire, Plaintiffs must allege sufficient "plus factors" to raise a plausible inference of a conspiracy. *See Twombly*, 550 U.S. at 556 n.4 (discussing examples of plus factor allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing Plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism.").  Plaintiffs do not come close to meeting this burden; the FAC simply recycles, at somewhat greater length, the conclusory allegations this Court previously rejected.

a.     <u>Market Power and Structure (FAC ¶¶ 116-21)</u>

Plaintiffs' allegation that the 74 insurance companies they have named as Defendants held 86% of the private passenger auto insurance market in Illinois at the end of 2012 (FAC ¶ 116) does not plausibly suggest that Defendants entered into the elaborate conspiracy alleged in the FAC.  In fact, the market share data included in the FAC weighs against implying any agreement to conspire here.  Only two of the 74 Defendants are alleged to have had more than 10% of the market in 2012 – the other Defendants are alleged to have significantly smaller market shares, with 28 Defendants holding less than 1% market share.  (*Id.*)  Such a

market is a far cry from the concentrated, oligopolistic market structure in which antitrust conspiracies are typically implied. *See, e.g., In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (finding this plus factor present in antitrust action where the four defendants sold 90% of U.S. text messaging services, explaining that "it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' (underselling the agreed price by a member of the group) without having to create elaborate mechanisms, such as an exclusive sales agency, that could not escape discovery by the antitrust authorities").   Where, as here, the relevant market (as alleged by Plaintiffs) is substantially decentralized, has a large number of participants with smaller individual market shares, and lacks significant barriers to entry, any attempt to design, implement, and enforce the purported conspiracy alleged in the FAC would be nearly impossible. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 1430 (last updated 8/2015).   Regardless, it is well established that "the mere (collective) possession of market share is not suggestive of collusion." *A&E*, Doc. 341 at 9.

b.       Opportunities To Conspire (FAC ¶¶ 421-47)

In support of their theory that 74 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Illinois, Plaintiffs point to Defendants' membership in various trade associations and standard-setting organizations.   (*See* FAC ¶¶ 423-47.)   Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy.   (*See id.* ¶¶ 427-31, 434-37, 441-42.)

Contrary to Plaintiffs' claims, and as this Court has already held, mere opportunities

to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had independent, rational reasons to be at the alleged meeting. *A&E,* Doc. 293 at 17 n.11 ("that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement."); *see also Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."). "Even if all of the Defendants had been members of one such organization, it would not aid the Plaintiffs' efforts to state a claim, because participation in trade organizations 'provides no indication of conspiracy.'" *A&E*, Doc. 341 at 10 (citation omitted).

Moreover, Plaintiffs have not alleged facts that show any opportunity to conspire in the first place. Notably, there is no allegation that all 74 Defendants were members of any single trade association.[5] Plaintiffs do not identify a single meeting of any of these trade

---

[5] Only nine Defendants are alleged to be members of the American Insurance Association (FAC ¶ 423), and only sixteen are alleged to be members of the Property Casualty Insurers Association of America (*id.*). Only four are alleged to be members of the Certified Automotive Parts Association ("CAPA") (*id.* ¶ 441), which also includes body shop members – making its attractiveness as a conspiracy-planning location doubtful at best. Only five are alleged to be members of the National Association of Mutual Insurance Companies ("NAMIC") (*id.* ¶ 424), and only nine are alleged to be members of the Insurance Institute for Highway Safety ("IIHS") (*id.* ¶¶ 434). State Farm, which purportedly plays a leading role in the conspiracy (*id.* ¶ 121), allegedly belongs only to CAPA, NAMIC, and IIHS. (*Id.* ¶¶ 425, 441.) Indeed, Plaintiffs have not identified any trade association memberships for 11 of the Defendants. (*Id.* ¶ 426).

associations, who attended, when it occurred, what contacts or communications occurred, or how any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiffs allege. *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [Defendants]").[6]

c.      Common Motive To Conspire (FAC ¶¶ 448-78)

As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs.  (*See* FAC ¶ 449.)  A profit motive is not sufficient to articulate a common motive to conspire.  *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices.").

As this Court previously noted, the parallel pricing conduct alleged by Plaintiffs is in each Defendant insurer's independent, profit-maximizing self-interest, which renders Plaintiffs' conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *A&E*, Doc. 341 at 9; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the

---

[6] The FAC includes a throwaway allegation that an unidentified "Progressive representative" in Pennsylvania speculated that unidentified insurance companies jointly set "rates" and that "new rates" "probably" would be determined at a then-future meeting in April 2015.  (FAC ¶ 254.)  This employee's speculation falls far short of supporting the plausibility of the multi-year and multi-faceted conspiracy claim Plaintiffs attempt to allege.  Nor does the FAC allege that the supposed meeting ever occurred, which insurers attended, or any details about what was discussed.

attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

In the FAC, Plaintiffs have attempted to piece together a far-fetched theory that some Defendants were somehow incentivized to conspire because they have relationships with BlackRock. (FAC ¶¶ 459-76.) Plaintiffs allege that six of the 74 Defendants invest "in or through" BlackRock, an asset management firm that manages over $4.32 trillion.[7] (*Id.* ¶¶ 459-60.) Plaintiffs claim, among other things, that BlackRock owns shares of a paint manufacturer, PPG Industries, and a supplier of recycled parts, LKQ Corporation. (*Id.* ¶¶ 461, 469.) Plaintiffs claim that all 74 Defendants therefore somehow share a motive to conspire, for reasons that are unclear, "through increased sales of the products sold by" PPG and LKQ. (*Id.* ¶¶ 466, 475.) Plaintiffs' contrived theory includes no facts to show that any Defendants coordinated their investments in BlackRock or had any say in BlackRock's investment decisions. Moreover, Plaintiffs do not allege that any Defendants have required that a specific type of paint be used, let alone PPG's paint, or that all Defendants require that LKQ's recycled parts must be used for repairs. (*Id.* ¶¶ 461-76.) Finally, the FAC is utterly devoid of any explanation of how 6 defendants' alleged investment "in or through" BlackRock could have motivated the remaining 68 defendants to engage in any kind of conspiracy. This conspiracy theory is utterly baseless and implausible.

        d.     <u>Action Against Self-Interest (FAC ¶¶ 479-82)</u>

The FAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels

---

[7] Specifically, Plaintiffs allege that defendants State Farm, Allstate, Nationwide, GEICO, USAA, Liberty Mutual, and Progressive "invest with or through BlackRock." (*Id.* ¶¶ 466-67.)

they charge a different insurer.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage").  Plaintiffs' "argument fails for the obvious reason that paying as little as possible for repairs is clearly in the self-interest of automobile insurers, as it improves their bottom lines."  *A&E*, Doc. 341 at 8.  Defendants allegedly set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges.  (*See, e.g.*, FAC ¶¶ 178, 190-93, 271, 276, 302, 322-25.)  Plaintiffs offer nothing to suggest that Defendants' alleged refusal to pay higher prices was the result of anything other than the lawful, independent exercise of each individual Defendant's reasonable business judgment.

> ### 4. Plaintiffs' New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Price-Fixing Claim.

Plaintiffs have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "substandard or dangerous" replacement parts.  (FAC ¶¶ 112, 306, 334.)[8]  The FAC does not tie any of these allegations to any agreement by Defendants regarding repair or parts-

---

[8] The FAC is also replete with other body shop grievances concerning matters having no apparent logical relationship to Plaintiffs' claims.  Examples include DRP indemnity agreements (FAC ¶¶ 192, 350-51), and disclosures of aftermarket parts (*id.* ¶¶ 331-53).  These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

reimbursement rates or policies.  There are no non-conclusory allegations of parallel conduct with respect to parts or procedures to support a conspiracy claim in the first place.

To the contrary, these new allegations underscore only differences among Defendants' alleged reimbursement practices and replacement part decisions, rendering any alleged conspiracy or agreement implausible.  With respect to the type of replacement parts the shops are allegedly required to use, some Defendants allegedly write estimates specifying the use of "aftermarket" (non-OEM) parts.  (*Id.* ¶ 142.)  Other Defendants allegedly specify salvage parts.  (*Id.*)  Yet other Defendants are alleged to be "exceptions."  (*Id.*)  With respect to parts procurement, some Defendants allegedly require parts to be ordered through the Parts Trader electronic marketplace.  (*Id.* ¶¶ 143-44.)  Other Defendants allegedly order the parts themselves and ship them to the body shop.  (*Id.* ¶ 147.)  Still others are alleged to tell the body shop which part to order from which vendor.  (*Id.* ¶ 148.)  With respect to reimbursement practices, Plaintiffs allege that Defendants base their estimates on different estimating software programs or independent appraisers.  (*Id.* ¶ 293.)  Defendants' decisions to reimburse for certain procedures also allegedly are based on different methods and appear to vary depending on the circumstances.  (*See id.* ¶¶ 297-300, 302, 304-16 & Exhibit 6.)  Such pervasive variations hardly support even the FAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs' suggestion that their allegations entitle them to discovery that will enable

them to repair the deficiencies in their claim (*e.g.*, FAC ¶¶ 281, 318) is wholly unwarranted. In the absence of "allegations that reach the level suggesting conspiracy" and of any "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim," allowing this case to proceed to enormously expensive antitrust discovery would contravene the dictates of *Twombly*.   550 U.S. at 559-60 (alteration in original) (citation omitted).   Indeed, given Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice.

**B.      The FAC's Boycott Allegations Are Insufficient as a Matter of Law.**

Count Two should be dismissed for the independent reason that Defendants' alleged conduct does not constitute a group boycott as a matter of law.   A group boycott under the antitrust laws requires proof of a "*concerted refusal*" to deal.   *Quality Auto Body*, 660 F.2d at 1206 (emphasis added); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982). The conduct that Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants[9] attempted to steer policyholders to non-plaintiff shops or suggested that certain of their policyholders not take their cars to certain body shops.   Steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[10]   Allegations concerning the purported impact of the alleged misconduct – for

---

[9] There are no such new allegations of attempted steering as to 67 of the 74 Defendants.   The addition of some isolated facts as to a few Defendants shines a spotlight on the truth that Plaintiffs have no basis for their broad allegations by all Plaintiffs against all Defendants.

[10] *See Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at \*19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower

example, that Plaintiff Broadway Collision's revenue from State Farm business *declined* (but did not cease) from 2013 to 2015 (FAC ¶¶ 401-02) – contradict the notion that even individual Defendants refused to deal with Plaintiffs.  Moreover, the allegations concerning Broadway clearly suggest why its volume of business declined:  That shop left State Farm's DRP program in 2013 and was no longer a "preferred provider" receiving referrals.  (*Id.* ¶ 401.)

In addition, as discussed above, there is no legally cognizable allegation of concerted action with respect to the alleged steering.  *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").  The FAC offers no facts to support the claim that 74 different insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made.  Their only "evidence" to support the existence of such an agreement is that a few Defendants allegedly steered business away from a few Plaintiffs in the months or years after those Plaintiffs dissociated from other insurers' direct repair programs.  However, this is merely a speculative interpretation of clearly insufficient allegations of conduct that cannot even reasonably be

---

prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices").  Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the word "coerce."  (FAC ¶ 538.)  None of the alleged conduct comes close to coercion.  *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

characterized as parallel.[11]

As this Court previously concluded in dismissing *A&E Auto Body* with prejudice, Plaintiffs' proffer of a few instances of alleged steering still fails to state a boycott claim:

> Despite the inclusion of these additional allegations, the Second Amended Complaint also fails to state a boycott claim. Even accepting the allegations as true, they in no way suggest that the Defendants have engaged in a concerted refusal to deal. Each of the incidents involves a single Defendant discouraging one of its insureds from dealing with a single Plaintiff (or misleading the insured into refusing to do so); there are no allegations that at the time any of these steering incidents occurred, the other Defendants (or any of them) were also preventing their insureds from utilizing that particular Plaintiff's services. Just as important, the Plaintiffs never allege that any of these incidents had anything to do with price-fixing, as they do not allege that, at the time the steering occurred, the shop at issue was demanding higher rates or otherwise challenging the price-fixing scheme.

*A&E*, Doc. 341 at 12-13.  There is no reason to reach a different conclusion here.

### C.   Dismissal With Prejudice Is Appropriate And Warranted.

Given that Plaintiffs in this case share the same lead counsel with plaintiffs in all but one of the MDL cases, there is no reason to believe Plaintiffs would be successful in curing the persistent defects of their federal antitrust claims if given yet another opportunity to amend.  As this Court ruled in *A&E Auto Body*, it is apparent at this stage of the litigation that any further amendment would be futile.  *A&E*, Doc. 341 at 20.  Accordingly, the Court should dismiss Plaintiffs' claims against Defendants *with prejudice*.[12]

---

[11] As Plaintiffs themselves allege, DRP membership results in a shop being listed as a recommended provider, leading to an increase in patronage.  (FAC ¶ 173.)  It is not surprising, therefore, that a shop's revenue would decline after leaving an insurer's direct repair program.

[12] *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1264 (11th Cir. 1998) (affirming dismissal with prejudice because "we conclude Aquatherm can prove no set of facts in support of its claims which would entitle it to relief under the federal antitrust laws"); *Postell v. Fifth Third Bank*, 2013 WL 2042805, at *1 (M.D. Fla. May 15, 2013) (amended complaint dismissed with prejudice where it failed to cure identified deficiencies in prior complaint); *Ivanovic v. Overseas Mgmt. Co.*, No. 11-80726-CIV, 2011

### III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' First Amended Complaint in this action in its entirety and with prejudice.

Dated:  October 9, 2015                    Respectfully submitted,

/s/  Lori J. Caldwell
Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel:  (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

Richard L. Fenton (admitted pro hac vice)
Mark L. Hanover (admitted pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel:  (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone:  (415) 882-5000
Facsimile:  (415) 882-0300
bonnie.lau@dentons.com

*Attorneys for Defendants Allstate Fire and Casualty*
*Insurance Company, Allstate Indemnity Company,*

---

WL 5508824, at *4 (S.D. Fla. Nov. 9, 2011) ("As Plaintiff fails to . . . satisfy basic federal pleading standards, the Amended Complaint must be dismissed as to all eight moving Defendants for failure to state a claim. Such dismissal should be with prejudice because Plaintiff has already once been granted an opportunity to amend and it is apparent that any further amendment would be futile.").

*Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Encompass Home and Auto Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company*

/s/ Timothy J. Rooney (w/permission)
Timothy J. Rooney (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700
trooney@winston.com

Laura Besvinick
STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard
Suite 3100
Miami, Florida 33131
Telephone: (305) 789-9300
Facsimile: (305) 789-9302
lbesvinick@stroock.com
Fla. Bar No. 391158

*Counsel for Travelers Commercial Insurance Company and The Travelers Home and Marine Insurance Company*

/s/ Lori McAllister (w/permission)
Lori McAllister (P39501)
Theodore J. Greeley (P77862)
DYKEMA GOSSETT PLLC
201 Townsend, Suite 900
Lansing, MI  48933
Phone: (517) 374-9150
lmcallister@dykema.com

*Counsel for Auto-Owners Insurance Company*

24

/s/ Kathy L. Osborn (w/permission)
Kathy L. Osborn, Indiana Atty. No. 21927-53
Ryan M. Hurley, Indiana Atty. No. 24956-49
Sarah C. Jenkins, Indiana Atty. No. 26421-53
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Kathy.osborn@faegrebd.com
Ryan.hurley@faegrebd.com
Sarah.jenkins@faegrebd.com
Tel. (317) 237-0300
Fax (317) 237-1000

Michael S. McCarthy, Colorado Atty. No. 6688
Heather Carson Perkins, Colorado Atty. No. 30168
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203-4532
Tel. (303) 607-3703
Fax (303) 607-3600
Michael.mccarthy@faegrebd.com
Heather.perkins@faegrebd.com

*Counsel for American Family Mutual Insurance Company*

/s/ Kathy J. Maus (w/permission)
Kathy J. Maus, Esq.
Florida Bar No. 896330
Julius F. "Rick" Parker
Florida Bar No. 160857
BUTLER WEIHMULLER KATZ CRAIG, LLP
3600 Maclay blvd., Suite 101
Tallahassee, FL 32312
Phone: (850) 894-4499
Fax: (850) 894-4999
kmaus@butlerpappas.com
jparker@butlerpappas.com

*Counsel for Mercury Insurance Company of Illinois*

/s/ Christopher C. Skambis (w/permission)
Christopher C. Skambis
Florida Bar No. 0262358
THE SKAMBIS LAW FIRM
720 Rugby Street, Suite 120
Orlando, Florida 32804
Telephone: 407-649-0090
Fax: 407-649-0191
Email: cskambis@skambislaw.com

*Counsel for Safeway Insurance Company*


/s/ John J. Haggerty (w/permission)
John J. Haggerty, Esq. (admitted pro hac vice)
FOX ROTHSCHILD LLP
2700 Kelly Road, Suite 300
Warrington, PA 18976
Telephone: (215) 345-7500
Facsimile: (215) 345-7507
JHaggerty@foxrothschild.com

*Counsel for Westfield Insurance Company*


/s/ William M. Hannay (w/permission)
William M. Hannay (IL Bar No. 3125910)
Gary M. Klinger (IL Bar No. 6303726)
Schiff Hardin LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
Telephone:  (312) 258-5500
Fax:  (312) 258-5600

*Counsel for Great Northern Insurance Company*


/s/ Jeffrey R. Seewald (w/permission)
Jeffrey R. Seewald
Texas State Bar No. 17986640
MCGLINCHEY STAFFORD, PLLC
1001 McKinney Street, Suite 1500
Houston, Texas 77002
Phone: 713-520-1900

Fax: 713-520-1025
jseewald@mcglinchey.com

Anthony J. Rollo
Louisiana State Bar No. 01133
MCGLINCHEY STAFFORD, PLLC
301 Main Street, 14th Floor
Baton Rouge, LA 70801
Phone: 225-383-9000
Fax: 225-343-3076
arollo@mcglinchey.com

Randy R. Dow
Florida Bar No. 121118
MCGLINCHEY STAFFORD PLLC
One East Broward Blvd., Suite 1400
Fort Lauderdale, FL 33301
Phone: 954-356-2501
Fax:    954-333-3847
rdow@mcglinchey.com

*Counsel for Affirmative Insurance Company*


/s/ Jeffrey S. Cashdan (w/permission)
Jeffrey S. Cashdan, admitted pro hac vice
Christine A. Hopkinson, admitted pro hac vice
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Phone:  (404) 572-4600
Facsimile:  (404) 472-5139
jcashdan@kslaw.com
chopkinson@kslaw.com

/s/ Michael R. Nelson (w/permission)
Michael R. Nelson, admitted pro hac vice
Kymberly Kochis, admitted pro hac vice
Francis X. Nolan, admitted pro hac vice
SUTHERLAND ASBILL & BRENNAN LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036-7703
Telephone:  (212) 389-5068
michael.nelson@sutherland.com

kymberly.kochis@sutherland.com
frank.nolan@sutherland.com

*Counsel for Progressive Direct Insurance Company*
*and Progressive Northern Insurance Company*


/s/ Michael R. Pennington (w/permission)
Michael R. Pennington
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
205.521.8391
205.488.6391
mpennington@babc.com

*Counsel for First Acceptance Insurance Company, Inc.*


/s/ Rowe W. Snider (w/permission)
Rowe W. Snider -- Trial Counsel
Matthew T. Furton
Julia C. Webb
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 443-0667 (direct)
Facsimile: (312) 896-6667
rsnider@lockelord.com

*Counsel for Amica Mutual Insurance Company*


/s/ Seth A. Schmeeckle (w/permission)
Seth A. Schmeeckle, Trial Counsel
Louisiana Bar No. 27076
LUGENBUHL, WHEATON, PECK, RANKIN
 & HUBBARD, A LAW CORP.
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:  (504) 568-1990
Fax:  (504) 310-9195
sschmeeckle@lawla.com

Marjorie M. Salazar
Florida Bar No. 0939021
LUGENBUHL, WHEATON, PECK, RANKIN
   & HUBBARD, A LAW CORP.
815 Walker St., Suite 1447
Houston, TX 77002
Telephone:  (713) 222-1990
Fax:  (713) 222-1996
msalazar@lawla.com

*Counsel for Horace Mann Insurance Company And
Horace Mann Property & Casualty Insurance
Company*


/s/ David L. Yohai (w/permission)
David L. Yohai (admitted *pro hac vice*)
John P. Mastando III (admitted *pro hac vice*)
Eric Hochstadt (admitted *pro hac vice*)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: 212-310-8000
Facsimile: 212-310-8007
Email: david.yohai@weil.com
Email: john.mastando@weil.com
Email: eric.hochstadt@weil.com

*Counsel for 21st Century Centennial Insurance
Company; 21st Century North America Insurance
Company; Illinois Farmers Insurance Company; and
Mid-Century Insurance Company*


/s/ Edmund W. Searby (w/permission).
Edmund W. Searby (Illinois 6204351)
Michael K. Farrell (Ohio No. 0040941)
Daniel M. Kavouras (Ohio No. 0089773)
BAKER & HOSTETLER LLP
PNC Center
1900 East Ninth Street, Suite 3200
Cleveland, Ohio  44114-3482
Telephone:  216.621.0200

Facsimile:  216.696.0740
esearby@bakerlaw.com
mfarrell@bakerlaw.com
dkavouras@bakerlaw.com

*Counsel for Kemper Independence Insurance Company*


/s/ William J. Kelly III  (w/permission)
William J. Kelly III (LA Bar #21662, CO Bar #38749)
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, Colorado 80202
Tel: (720) 236-1800
Fax: (720) 236-1799
wkelly@kellywalkerlaw.com

Charles I. Hadden (D.C. Bar # 277855)
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2025
chuck.hadden@troutmansanders.com

David F. Cutter (IL Bar # 6276948, DC Bar # 456700,
MD Bar (no number assigned))
TROUTMAN SANDERS LLP
55 W. Monroe St., Suite 3000
Chicago, IL 60606
(312) 759-5556
david.cutter@troutmansanders.com

*Counsel for COUNTRY Mutual Insurance Company,*
*COUNTRY Casualty Insurance Company and*
*COUNTRY Preferred Insurance Company*


/s/ Frank G. Burt (w/permission)
Frank G. Burt (FL Bar No. 197963)
C. Todd Willis (FL Bar No. 670766)
CARLTON FIELDS JORDEN BURT PA
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, D.C. 20007

Telephone:  202.965.8100
Facsimile:  202.965.8104
fburt@cfjblaw.com
twillis@cfjblaw.com

*Counsel for American Bankers Insurance Company of Florida*


/s/ Thomas G. Rohback (w/permission)
Thomas G. Rohback
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Facsimile: (860) 275-8101
trohback@axinn.com

*Counsel for Hartford Accident and Indemnity Company; Hartford Casualty Insurance Company; Hartford Fire Insurance Company; Hartford Insurance Company of Illinois; Hartford Underwriters Insurance Company; and Property and Casualty Insurance Company of Hartford*


/s/ Michael E. Mumford (w/permission)
Ernest E. Vargo, *Admitted Pro Hac Vice*
evargo@bakerlaw.com
Michael E. Mumford, *Admitted Pro Hac Vice*
mmumford@bakerlaw.com
BAKERHOSTETLER LLP
PNC Center, Suite 3200
1900 East 9th Street
Cleveland, OH 44114-3482
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Counsel for Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, Liberty Insurance Corporation, and Safeco Insurance Company of Illinois*

/s/ Michael B. de Leeuw (w/permission)
Michael B. de Leeuw
John J. Sullivan
Jason Bonk
COZEN O'CONNOR
45 Broadway, Suite 1600
New York, NY 10006
P: (212) 509-9400
F: (212) 509-9492
MdeLeeuw@cozen.com
JSullivan@cozen.com
JBonk@cozen.com

*Counsel for AIG Property Casualty Company*


s/ Joseph E. Ezzie (w/permission)
Joseph E. Ezzie
Email:   jezzie@bakerlaw.com
BAKERHOSTETLER
Capitol Square, Suite 2100
65 East State Street
Columbus, OH  43215-4260
Telephone:   614.228.1541
Facsimile:     614.462.2616

*Counsel for Grange Mutual Casualty Company
and Grange Indemnity Ins. Co.*

/s/ Michael H. Carpenter (w/permission)
Michael H. Carpenter
Michael N. Beekhuizen
David J. Barthel
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100 telephone
(614) 365-9145 facsimile
carpenter@carpenterlipps.com
beekhuizen@carpenterlipps.com
barthel@carpenterlipps.com

Mark J. Botti
Squire Patton Boggs (US) LLP
1200 19th Street, N.W., Suite 300
Washington, District of Columbia  20036
(202) 626-6600 telephone
(202) 626-6780 facsimile
mark.botti@squirepb.com

*Counsel for Nationwide Insurance Company of
America, Nationwide Mutual Fire Insurance Company,
Nationwide Property and Casualty Insurance
Company, Nationwide Mutual Insurance Company,
Harleysville Lake States Insurance Company, and
Allied Property and Casualty Insurance Company*

/s/ Robert L. Steinmetz (w/permission)
Robert L. Steinmetz
Gwin Steinmetz & Baird, PLLC
401 W. Main Street, Suite 1000
Louisville, KY 40202
Direct:  502-618-5711
Cell:     502-836-8028
Fax:      502-618-5701
rsteinmetz@gsblegal.com

*Counsel for Safe Auto Insurance Company*

/s/Hal K. Litchford (w/permission)
Hal K. Litchford (272485)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
hlitchford@bakerdonelson.com

Amelia W. Koch *(Admitted Pro Hac Vice)*
Steven F. Griffith, Jr. *(Admitted Pro Hac Vice)*
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
akoch@bakerdonelson.com
sgriffith@bakerdonelson.com

*Counsel for USAA Casualty Insurance Company and
USAA General Indemnity Company*

/s/ Eric P. Berlin (w/permission)
Eric P. Berlin
JONES DAY
77 West Wacker Dr.
Chicago, IL 60601-1691
t: (312) 782-3939
f: (312) 782-8585
epberlin@jonesday.com

Jeffery D. Ubersax / Joseph R. Coburn
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH 44114-1190
t: (216) 586-7112
f: (216) 579-0212
jdubersax@jonesday.com
jcoburn@jonesday.com

James M. Jones / Anderson T. Bailey
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:  (412) 391-3939
Fax:  (412) 394-7959
jmjones@jonesday.com
atbailey@jonesday.com

*Counsel for Erie Insurance Company and Erie Insurance Exchange*

/s/ Johanna W. Clark (w/permission)
Johanna W. Clark
Florida Bar No. 196400
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

*Counsel for State Farm Mutual Automobile Insurance
Company and State Farm Fire and Casualty Company*

/s/ E.K. Cottrell (w/permission)
E.K. Cottrell (Fla. Bar No: 0013579)
EMAIL: ecottrell@sgrlaw.com
SMITH, GAMBRELL & RUSSELL, LLP
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Telephone:   (904) 598-6100
Facsimile:   (904) 598-6300

*Counsel for Dairyland Insurance Company*

36

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of October 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Lori J. Caldwell*
Lori J. Caldwell
Florida Bar Number: 0268674
RUMBERGER KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue
Orlando, FL 32801
Phone: (407) 839-4546
Fax: (407) 841-2133
lcaldwell@rumberger.com